# Lehigh Company *against* Field.

Agreement between a Coal and Navigation Company and an individual for the purchase of a boat by the latter of the former, on terms expressed in the company's printed regulations, one condition of which was, that the company will furnish its carriers with boats for cash at cost or on credit with interest, but that the ownership shall remain with the company till all the instalments of the price be paid, with a clause providing for a bill of sale at the close. The company was to pay the tolls, and the contractor to take freight from no other quarter. The boat retained its place in the company's register, having its number painted in letters and figures on its stern, not distinguishable from the other boats of the company. *Held*, the boatman was merely the servant of the company till the boat was paid for, and that the delivery of possession of it during this agreement to the boatman did not make the boat his so as to be levied on by his creditors.

ERROR to the Common Pleas of *Bucks* county.

This was an action of trover for two canal boats, No. 228 and No. 145, Mauch Chunk register, which the defendants, William

Field, Alexander C. Brittain, Samuel B. Brittain, and Cornelius Sellers, had seized as the property of John Callahan, by virtue of a writ of foreign attachment against Callahan in favour of A. S. Brittain & Co., and had sold in December 1836, under an order of sale granted by the court, notwithstanding notice given by the plaintiff.

These boats were built by the Lehigh Coal and Navigation Company, and delivered to Callahan in pursuance of a printed contract, such as was usual with them in the year 1833, and which was afterwards renewed. Callahan retained the possession of the boats in 1833 and 1834. On the boat No. 145 he had a credit on the books of the company on freight carried, for $156.10, and on No. 228 a credit in 1834 of $142.80. In June 1836 the superintendent, Abbott, declared the contracts abandoned by Callahan. The register was produced, and showed the boats entered and registered, when contracted for, with whom contracted, and price and sums retained.

The form of the printed contract signed by Callahan and the superintendent was as follows, viz. :

This agreement, made the 13th day of the ninth month 1833, between John Callahan, contractor on the one part, and Abiel Abbott, superintendent on behalf of the Lehigh Coal and Navigation Company on the other part, witnesseth :

1. That the said contractor hereby agrees to purchase from the said company, on the terms mentioned in the third regulation of the said company's printed regulations for boating coal, hereunto annexed, one scow boat, number 228, Mauch Chunk Register.

2. That the said contractor will begin to boat coal for said company, under and subject to the above-mentioned printed regulations for boating coal, from Mauch Chunk to Philadelphia and intermediate places, as directed by said company, the ensuing season, as soon as practicable after being notified to do so by said company, and find boat, boat equipage, horses, hands, provisions, tow-lines, and all things necessary for boating, at the following prices, viz. :

　　From Mauch Chunk to Philadelphia, one dollar twelve cents
　　　per ton.
　　From Mauch Chunk to Bristol, one dollar per ton.
　　　"　　　ditto　　　" any intermediate place, in addition to
　　　eight cents per ton for unloading, one cent per ton per mile.

3. The said contractor will continue as steady and regular as practicable in boating coal throughout the season, and will not take such back freight as will cause interruptions in the regular trips. And if, in the opinion of the said superintendent, the master of said boat should wilfully neglect or unreasonably delay the navigation of said boat, the said superintendent shall have power to determine that this contract has been abandoned, and such determination shall exonerate the company from every obligation

VIII. — 30　　　　　　*v* *

imposed on them by this contract, and they may immediately proceed to dispose of said boat in the same manner as if this contract had never been made.

4. The said superintendent, on behalf of the said company, agrees to sell the said contractor said scow boat, on the terms herein above mentioned, for the sum of $287.50, and to pay the said contractor for all coal boated by him, at the rates mentioned in this agreement, and in the manner mentioned in the second regulation of the company's printed regulations for boating coal, hereunto annexed.

In witness whereof, the said parties have hereunto set their hands and seals, at Mauch Chunk.

his
JOHN ⋈ CALLAHAN, [L. s.
mark.
ABIEL ABBOTT, [L. s.]
*Superintendent.*

Witness, N. HOYT.

The following was endorsed on the above, and executed by the same parties:

It is expressly agreed that no transfer of this contract shall be allowed, without the consent of the company, and that no sale of the boat, by process against the contractor, shall authorize the purchaser to hold or keep possession of the boat, or give him or them any interest therein or title thereto. Mauch Chunk, 13th day of 9th month 1833.

his
JOHN ⋈ CALLAHAN, [L. s.]
mark.
ABIEL ABBOTT, [L. s.]

Witness, N. HOYT.

The following printed regulations accompanied and were attached to the said agreements, at the time of their execution:

### Regulations for boating Coal.

Persons who contract with the Lehigh Coal and Navigation Company for boating coal will be subject to the following rules, viz.: —

1. All contracts are to be for the season, the termination of which is to be decided by the Board of Managers, and the boats, during the contracts, are to be confined exclusively to the business of the company, except for back freights.

2. One-tenth of the amount of freight to be retained by the company until the close of the season, as security for the fulfilment of the contract, &c.: if not fulfilled, or if declared to be abandoned by the company's superintendent, the said one-tenth to be forfeited.

3. The company will sell contractors the necessary boats at cost for cash, or the contractors may pay for them, cost and interest,

by leaving in the hands of the company at least ten dollars for each trip to Bristol or Philadelphia, or in that proportion for shorter trips, until the amount is made up. When fully paid for, the boat will be transferred by bill of sale to the contractors, but, until then, the boat to remain the property of the company, and in case of forfeiture of contract, the amount paid on account of the boat to be forfeited also.

4. All boatmen in the service of the company are to conform to the rules and regulations which may from time to time be adopted for boats using the harbours or navigation of the company, or the harbours or navigation of the State canal.

5. The boats will be loaded in the Mauch Chunk harbour, in the order of their arrival there, provided the boatmen are ready, and attend to take their turn, otherwise the next in order will be loaded first.

6. The boatmen must bring their boats to the shute, guy them there while loading, and receive the coal as discharged from the shute.

7. As soon as the coal is delivered in the boats, it will be under the sole charge of the boatmen, and contractors shall be accountable to the company for its safe delivery and discharge at its place of destination, agreeably to the receipt or bill of lading, to be signed by the captain, containing an obligation so to deliver it.

8. At Bristol and Philadelphia, the crews of the boats will be assisted in the discharge of the coal by hands furnished by the company, so as to give the utmost despatch, and the boats will be discharged in the order of their arrival, provided the crews are ready and attend to take their turn, otherwise the next in order will be unloaded first. Coal ordered to any other place on the route than Bristol or Philadelphia, shall be discharged from the boats by the contractors.

9. The company will furnish steamboats at Bristol to tow such boats as are to discharge at Philadelphia, with as little delay as practicable, both down and up, and the boatmen are to continue the charge of the boat in tide; and in case of the sinking of the boat, the loss of the coal to be the company's, and the price of freight to be the loss of the contractor.

10. The company will pay all tolls on canal and boat, on both the Lehigh and Delaware canals. For any other freight, the contractor must pay the toll.

11. Should a breach or breaches occur in the Lehigh or Delaware canals during the boating season, the company will agree to pay three dollars per day for each boat, for all the time over one day that the boats may be detained while such breach or breaches are repairing; and as a compensation for such payments, it is understood that the boatmen are to assist in repairing such breaches, if required by the supervisor employed by the State, or the company's agent, if on the Delaware canal, and by the superintendent

[Lehigh Company v. Field.]

or agent of the company, if on the Lehigh canal; and the wages for such time as they may be employed, either by the State or the company, is to be received by the company. *Provided*, that if the boatmen refuse or neglect to assist at the repairing of breaches as before mentioned, they forfeit the payment of the three dollars per day for their detention.

12. The company will guarantee that the loads for each scow boat shall average fifty tons for the season; and should the average be more than fifty tons, the contractors to have the advantage of the increased quantity.

Nelson Hoyt, a witness for the plaintiffs, testified that Abiel Abbott was the superintendent of the company at the date of these agreements. The Lehigh Company built the boats shortly after the contracts were made. Callahan got possession by the terms of the contracts. Callahan was in the employ of the company two or three years after the date of the first agreement. The boats were used for transporting coal from Mauch Chunk to Philadelphia by the company. Mr Brittain got possession of the boats in 1834, in the fall. Witness found the defendants in the possession of the boats at that time, and gave verbal notice at the sale and to the crier that the boats belonged to the company at New Hope; that the company held exclusive possession and ownership of the boats, and they would hold the sheriff and purchasers liable for the boats, under the authority of the Lehigh Coal and Navigation Company. One of the Brittains was there. The boats were worth $200 apiece at that time. Sellers and Brittain held a short conversation after the notice, and then the boats were sold and bought by Brittain. They refused to give up the boats to witness.

On his cross-examination he stated he received the boats after they were built, took them off the contractor's hands, and gave credit for them. He was in the employ of the company. The boats were built in the latter part of 1832, or beginning of 1833. The sale was made in January 1837. The boats had not been under any shelter. He was on the boats and saw them, not injured further than fair wear and tear. He gave no notice after the sale. He made no demand of any one after the sale. The only demand was the notice before the sale of the boats. The boats, he thought, went to Jersey after the sale.

W. H. Sayre, a witness for the plaintiffs, testified that he was an officer of the Lehigh Coal and Navigation Company—the collector at Mauch Chunk and boating clerk—since 1828. That, on boat 145, in 1833, Callahan paid $97.90, and, in 1834, $58.20, making $156.10; that he paid on boat 228, in 1833, $41.90, and, in 1834, $100.90, making $142.80. These sums were retained from the amount of freight earned by Callahan; he paid no money in cash for them. On the 6th June 1836, including $31.86 interest, Callahan owed on boat 145 $165.76, and on boat 228, including $29.60

interest, $174.37. He was charged interest on the price of boats from delivery, and was allowed interest on the carriage. Callahan got the boats under the contracts. The company never refunded the amount retained to Callahan.

The plaintiffs then offered in evidence the following letter from A. Abbott, directed to William Zane, South Easton:—

"Mauch Chunk, June 29, 1836.

"Dear Sir:—Yours respecting the two boats which Callahan had is received. You will do whatever Porter advises to be done in that case. The boats are declared abandoned, as provided for in the contract."

W. H. Sayre called again.—This paper is the hand-writing of Abiel Abbott. The paper dated 29th June 1836 is the only written entry of abandonment that I know of. Mr Abbott, the superintendent of the company, is dead, and this was found in the office of the company, in his hand-writing. Wm. Zane was superintendent of the company at South Easton. Callahan received these two boats.

The admission of this paper was objected to, but it was admitted, and the defendants excepted.

Ingham Smith, affirmed. — I was present when the boats were sold. I heard Mr Hoyt give public notice to all that were there that the Lehigh Company claimed the boats as exclusively theirs. He demanded them for the company. Mr Brittain said, persons buying them, if they did not get them, they would not have them to pay for. He assumed the responsibility of selling them, and directed the crier to go on and sell them.

Joseph Butler, sworn.—In the fall of 1836 I was agent for the Lehigh Company, on the Delaware division. I received a power from Mr Zane, agent for the company at South Easton, dated Nov. 4, 1836, to demand and take possession of the boats. On the 7th November 1836 I called on Brittain and demanded the boats in the name of the Lehigh Company. Mr Brittain replied they were now in the hands of the law; he was willing to abide the decision of the law; but said, if the Lehigh Company would pay him what they retained from Callahan, he would give them up. On the 10th November I called at the sheriff's office in Doylestown; Mr Field, then sheriff, absent; I demanded the boats of Dungan, deputy sheriff. He said he could do nothing unless he saw the attorney, Mr M'Dowell. M'Dowell, after being consulted, said the boats would not be given up. He was the attorney of Brittain.

W. H. Sayre, again.—"This is the book that contains the register."

The plaintiffs then gave in evidence the following entries from said book:—

[Lehigh Company v. Field.]

## CANAL BOATS.

| BOAT No. 145. | When contracted or transferred. | To whom contracted. | Price. | Retained. | Remarks. |
|---|---|---|---|---|---|
| 6 month, 1836—sent contract to Wm. Zane, to be given to Jas. M. Porter. 229. | 4 mo. 16, 1833. 1834. | John Callahan. do. | 290 00 156 10 133 90 | 97 90 58 20 156 10 | ‡ |
| 6 month—sent contract to Wm. Zane, to be given to Jas. M. Porter. | 9 mo. 13, 1833. 1834. | John Callahan. do. | 287 50 142 80 144 70 | 41 90 100 90 142 80 | |

The defendants gave in evidence the record of a suit, brought in the Common Pleas of Bucks county, No. 39, to Feb. Term 1835, by A. C. Brittain & S. B. Brittain, trading under the firm of A. C. Brittain & Co., against John Callahan, attachment in case, bail $640, issued Jan. 30, 1835, in which the sheriff was directed to attach the two canal boats, or scows.

They further gave in evidence the writ of attachment, and the petition of A. C. Brittain to said court for an order to sell the boats, &c., which was filed on the 14th March 1835. On the 16th December 1836 the sheriff returned that he had sold the canal boats to A. C. Brittain & Co. for $320. No judgment was entered in this case.

The defendants then called H. N. Beaumont, who testified that he bought these boats of Mr Brittain, and paid $275 for both. On his cross-examination he stated he paid for them in the summer of 1837. They lay in the basin below New Hope. They were sunk when he bought them; not as good as he expected when he bought them. When he paid Brittain he threw off the interest, because the bottoms were injured. It cost over $100 to repair them.

The court (BURNSIDE, President) charged the jury as follows: ¹

You will observe by the regulations of the company, No. 3, they proposed to *sell* contractors boats at cost for cash, or the contractors may pay for them cost and interest, by leaving in the hands of the company at least ten dollars for each trip to Bristol or Philadelphia, or in that proportion for shorter trips, until the amount is made up. When fully paid for, the boat will be transferred by bill of sale to the contractors, but until then the boat to remain the property of the company, and in case of forfeiture of contract, the amount paid on account of the boat to be forfeited also. The articles of agreement were predicated on this regulation. The company also furnished horses, provisions, tow-lines, and all things necessary for boating, at specific prices. By the contract the superintendent shall have power to determine that the contract has been abandoned, and such abandonment shall exonerate the company from any obligation imposed on them by this contract,

Lehigh Company v. Field.]

and they may immediately proceed to dispose of the boat, as if the contract had never been made. On these terms the scows were sold—No. 145 for $290, and No. 228 for $287.50. Callahan got possession of the boats, and retained it in 1833 and 1834. On 145 he had a credit on the books of the company for $156.10, and on 228 a credit, in 1834, of $142.80.

The inquiry for the court is, is such a contract legal? It is all right as between the parties; but the inquiry here is, can it be sustained against the creditors of the purchasers of the boats upon such terms? In the early period of our judicial decisions there was a strong leaning in favour of such contracts, but as the country increased in population, and the transactions and business of the country increased, it was found not to answer any valuable purpose. In *Clow* v. *Woods*, (5 *Serg. & Rawle* 286), it was decided that a mortgage of the bark, tools in a tan-yard, and the leather and skins, with a provision that the mortgagor, the tanner, should remain in possession in the tanning and finishing the leather, was *per se* fraudulent and void against *bonâ fide* creditors. The subject again came before the Supreme Court, in *Babb* v. *Clemson*, (10 *Serg. & Rawle* 423). There Benjamin Pusey sold cattle to his sister-in-law, Elizabeth Clemson, and there was evidence that she paid Peter, a man on the farm, to take care of the latter: they remained on the same farm. This was held to be a colourable possession, and fraudulent as against creditors. Again, in *Martin* v. *Mathiot*, (14 *Serg. & Rawle* 214), the Supreme Court held that on a sale of chattels, if the vendor and vendee agree that the possession shall pass to the vendee, but the property remain in the vendor until the whole purchase money is paid, such agreement, as respects creditors, is fraudulent; and it is immaterial whether it appear that the creditor trusted the debtor on the credit of the goods which were in his possession, or not. We might cite other cases. Upon a careful examination of these written papers, it is the solemn opinion of the court, that the agreement between the company and John Callahan, under the rules and regulations, is *per se* fraudulent, and that the plaintiffs cannot sustain this action. The legal as well as the actual possession of the goods was in Callahan; that it was a sale of the boats for a specific sum; that no bill of sale was essential to the sale, and that the policy of the law will not tolerate such agreement between the company and Callahan; that the agreement that no sale by process against the contractor shall authorize the purchaser to hold or keep possession of the boats, or give him or them any interest therein or title thereto, does not better the case of the plaintiffs. The article calls it a sale; and a sale of personal property, when the vendor claims the right to regain the property if the whole purchase money is not paid at an indefinite period of time, is fraudulent and void against creditors. The plaintiffs contend that it is necessary, by the maritime law, that a sale of a vessel should be in writing, and that it does

[Lehigh Company v. Field.]

not pass by parol. We have already instructed you tnat the sale of a canal boat may be made by parol. We do not think our canals are subject to the maritime law. We see nothing in the case to take it out of the rule we have stated.

To this opinion the plaintiffs excepted.

Errors assigned:

1. The court erred in charging that the plaintiffs could not sustain this action; that the agreement between the company and Callahan, under the rules and regulations, was *per se* fraudulent.

2. In charging that the legal, as well as the actual possession of the goods, was in Callahan.

3. In charging that the agreement between the company and Callahan that no sale by process against the contractor shall authorize the purchaser to hold or keep possession of the boats, or give him or them any interest therein or title thereto, does not better the case of the plaintiffs.

4. In charging that, where the vendor claims the right to regain the property if the whole purchase money is not paid at an indefinite period of time, the sale is fraudulent and void against the creditors.

5. In charging that the sale of a canal boat may be made by parol.

6. In charging that our canals are not subject to the maritime law.

*Chapman* and *Mallery*, for the plaintiffs in error.

This was only an agreement to sell. The boatman had no right in the boat until it was paid for. The cases relied on are not like this. His possession was as a servant of the company, restricted to boat for them by regulations. He could, therefore, acquire no credit upon it. The possession was consistent with the ownership by the company, and the purpose was honest. It is difficult to keep these persons to their duty. The boats are registered as the company's at Mauch Chunk, and the captain has a certificate of it, by regulations of the canal commissioners. A bill of sale was necessary before the title passed. 4 *Binn.* 258; 2 *P. R.* 451, 263; 6 *Watts* 126; 4 *Watts & Serg.* 177; 1 *Baldw.* 528; 20 *Wend.* 554; 7 *Watts* 375.

*Ross*, contra.

Under such an agreement and possession delivered, a creditor may levy an execution. It is an actual sale and possession, not an agreement. The words are, "agree to purchase," "to sell." It is a purchase on credit. The boatman is owner. The company pays him for carrying. Part of the money is paid. *Martin* v. *Mathiot* is not so strong a case as this. No money was paid there. *Clow* v. *Woods*, (5 *Serg. & Rawle* 286); *Babb* v. *Clemson*, (10 *Serg. & Rawle* 423); 5 *Whart.* 545.

[Lehigh Company v. Field.]

The opinion of the Court was delivered by

Gibson, C. J. — The case which most resembles the present, is *Martin* v. *Mathiot;* but it had an all-important feature which this has not — an actual, unqualified, and a visible change of the possession by delivery to the purchaser in part execution of the contract. In *Jenkins* v. *Eichelberger,* there was a present sale with an attempt to reserve a lien for the price, which the law did not allow: in our case there is only an agreement for a future sale. No more was determined in *Martin* v. *Mathiot,* than that an executory agreement to sell, accompanied by present delivery of possession in part execution of it, constitutes, as to third persons, a present and an unconditional sale, for the same reason that retention of possession defeats it where the intention is to pass the title at the time of the transaction; but a previous delivery of possession for a different purpose, would not turn an executory agreement into an actual sale any more as to third persons than as to the parties themselves. A naked agreement to sell a team to the owner's wagoner, continuing to drive it in his employer's service, would not, before execution of the contract by payment of the price, vest the title in any aspect, because the possession of a servant is the possession of the master; and had it appeared in *Martin* v. *Mathiot* that the team had been delivered to Michael as the plaintiff's wagoner, and that the latter was still using it in the plaintiff's service, the event of the case would have been different. Now the contract before us was an agreement to purchase on terms expressed in the company's printed regulations, a condition of which is that the company will furnish its carriers with boats for cash at cost, or on credit with interest, but that the ownership shall remain with the company till all the instalments of the price be paid; and what more distinctly shows these agreements to be executory, is the clause providing for a bill of sale to close the transaction. It is a condition also that a forfeiture of the contract to carry shall be a forfeiture of payments made towards the price of the boat; which would be nugatory if the property were vested by the contract in the carrier. There was, therefore, no present sale between the parties; and what delivery of possession was there to make it so as to any one else? By the regulations which were part of the contract, the persons who had the boat in charge were the company's servants acting under its control. The company was to pay the tolls, and the contractor was to take freight from no other quarter except as back loads. Thus the ostensible, as well as the actual ownership was in the company, and the possession in its servants. The boat retained its place on the company's register, having its number painted in letters and figures on its stern; and neither by its marks nor the manner of its employment could it be distinguished from the company's other boats. Had the intention even been to effect an immediate transfer of the property, it would have admitted of more than a doubt

[Lehigh Company v. Field.]

whether the delivery, such as it was, exempted it from execution by the company's creditors. The agreement, then, to put these two boats into Callahan's hands, not as his property or to make him the immediate owner of them, but to be managed by him as a servant under its control, could not be and was not employed as a device to deceive or defraud.

Judgment reversed, and *venire de novo* awarded.