[Leigh Bros. v. Mobile & Ohio R. R. Co.]

# Leigh Bros. *v.* Mobile & Ohio R. R. Co.

### *Detinue for Cotton.*

1. *Sale of cotton, what part of contract for.*—When a contract for the sale of cotton is made in a city or town in which a board of trade is organized, having rules regulating the sale of cotton, and the purchaser, being informed of these rules, does not dissent or object to them, but proceeds with the contract, those rules became a part of it, as if incorporated into it by express stipulation, although they have not existed so long, or been known and acted on so generally, as to become binding as a custom or usage of trade.

2. *Same; what necessary to constitute.*—To constitute a sale, the parties must mutually assent that the property in the thing sold shall pass to the purchaser. A contract which confers on the party proposing to buy a right to inspect, examine and re-weigh the cotton within a specified time, and, on paying or tendering the price within a specified time, to demand a transfer of the ownership and possession, and also confers on the seller a corresponding right to demand such inspection, examination and re-weighing within the prescribed time, is not a sale, but an executory agreement for a sale, and does not pass the title of the cotton to the purchaser.

3. *Same; effect of order by seller to warehouseman.*—In such a case, a written order by the seller to the purchaser, directing the warehouseman, with whom the cotton was stored, to deliver it to a railroad company, for inspection and examination by the purchaser, on his paying the storage, does not pass the title to him nor change the character of the original contract between the parties; but the railroad company becomes the bailee of the seller, as between him and the purchaser.

4. *Sale of chattel by one having no title; rule as to; exceptions to.*—The general rule is, that a sale or pledge of a chattel by a person, who, though he has possession, has no right of property, and no authority to sell, confers no title as against the true owner, although the purchaser pays a valuable consideration or advances money in good faith, and without notice of the title of the true owner; but there are several recognized exceptions to this rule.

5. *Same.*—In the case of an immediate sale, under which the purchaser takes possession, with a condition annexed, that on his failure to pay the price at a future day the vendor may reclaim the goods, or a stipulation that the title shall remain in him until the price is paid, the title of a sub-purchaser, without notice of the condition or stipulation, will prevail over that of the vendor; but this exception to the general rule, which is founded on the policy of the registration laws, is confined to cases where there has been an actual sale, as well as a change of possession.

6. *Same.*—Another exception is, where the seller parts with his property under such circumstances of fraud as will authorize him to reclaim it from the purchaser; yet, if there has been an actual sale, although induced by fraud, the title of the sub-purchaser for valuable consideration without notice, will prevail over that of the vendor.

7. *Same.*—Another exception is where the owner of goods has, by his own act or consent, given another such evidence of a right to sell, or otherwise dispose of them, as according to the customs of trade or the common understanding of the world, usually accompanies the authority to sell or dispose of goods; but to bring a case within the exception, the owner must do something more than merely entrust another with possession of his goods.

8. *Bailee, failure by, to assert lien on goods held, when waiver of.*—If a common carrier or other bailee, when goods are demanded of him by the true owner, refuses to deliver them except to the consignee, or to the person hold-

ing the receipt given for transportation, but asserts no lien for storage paid by him, he cannot afterwards set up that claim to defeat an action by the owner, but must be held to have waived it.

APPEAL from Circuit Court of Mobile.

Tried before Hon. HARRY T. TOULMIN.

, This was an action of detinue, brought by the appellants, Leigh Bros., against the appellee, the Mobile and Ohio R. R. Co., to recover twenty-three bales of cotton. On the trial it appeared that the plaintiffs were the owners of the cotton sued for on the 30th day of November, 1874, and had the possession thereof, and that on that day they sold, or contracted to sell, the same to one A. J. Foster, under the following circumstances :

The sale, or agreement to sell, was made in Columbus, Miss., and the evidence tended to show that a custom prevailed in said city in the cotton trade, that purchasers were allowed a certain time to re-weigh, sample, and examine the cotton, (sales always being made by samples), and if satisfied to pay for it ; that this was a general custom, based upon the rules of the board of trade of said city. The evidence also tended to show that such sales were considered *cash* sales, and that no title passed until after the examination and payment of the purchase money, and that possession of the cotton was given to the buyer for *examination only.* There was conflict as to the uniformity of this custom, and as to the construction of the said rules, and also as to the character of the orders generally given for examination ; and the evidence showed that sometimes unconditional orders were given, and sometimes warehouse receipts were delivered to the purchaser, and sometimes the number and marks, with an order to turn down for examination. There was evidence that some firms dealing in cotton, did not hold themselves bound by these rules, and that the plaintiffs sometimes departed from them. There was conflict as to when, in the opinion of the witnesses, the sale was complete and the title passed in such cases.

The evidence showed that Foster had come to Columbus only a week or two before his purchase of the cotton in controversy, was a stranger there, and that he had bought a few lots of cotton before this, paying cash for it, some of which cotton he had bought of plaintiffs ; that on the said 30th of November, 1874, he called in Williams, Johnson & Co., bankers, of that city, and inquired whether they would take his bills, drawn on a shipment of cotton, which he proposed to ship to Gardner & Foster, at Mobile, Ala. This was in the morning. They informed him that they would, if he would attach the bill of lading or railroad receipt to the bill

drawn on the shipment, and instructed their cashier to give him the money, if he brought his draft with the bill of lading attached.

About 11 o'clock of the same day he purchased of the plaintiffs the twenty-three bales of cotton sued for, and was told at the time, of the custom and rules of trade, and that though the rules allowed him time for re-weighing and examining the cotton, the sale was not complete until the money was paid. After this agreement of sale, the book-keeper of the plaintiffs gave him the following order:

COLUMBUS, MISS., Nov. 30th, 1874.

Messrs. R. M. Banks & Co.:

Deliver to M. & O. R. R. Co. the following cotton:

| H. C. Cocke | 5 |
| G. R. G. | 3 |
| $\frac{}{\text{J}}$ | |
| G. R. G. | 5 |
| $\frac{}{\text{J J}}$ | |
| W. S. M. | 10 |
| Shipmark, | [B] |

Mr. A. J. Foster will pay storage.

LEIGH BROTHERS.<br>Beman.

There was conflict in the evidence as to the character of this order under the rules, whether it was a general delivery order or an order for examination only, and whether it was in the usual form of examination orders.

One of the plaintiffs, F. M. Leigh, testified that he never intended the title to the cotton should pass, but distinctly told Foster, at the time of the sale, that it was to be a cash sale, and that no title could pass; that time was allowed only to allow him to weigh, sample and examine the cotton, and that the sale was complete only when the cash was paid. The said book-keeper testified that this order was given to deliver the cotton to the *railroad* at the instance of Foster, as he alleged that the platform of the railroad was a more convenient place to examine the cotton, and also requested him to put the ship mark [B], for the reason that he had no means of marking, and was unacquainted in the city; that he gave said order for the delivery of the cotton, and that it was to enable said Foster to examine the cotton. The form of this order was not known to the plaintiffs, but the authority of the clerk to give it was not disputed. Foster carried this order to the warehouse, where the cotton was stored by plaintiffs, and the cotton was sent in his name to

the railroad by the warehousemen, who received dray receipts for it from the company. After all the cotton had been thus delivered, Foster applied to the railroad agent at Columbus for a general receipt for all, in place of the dray receipts, and received the following receipt:

Mobile and Ohio Railroad Co., }<br>
C Depot, Nov. 30th, 1874. }

Received from A. J. Foster twenty-three bales of cotton, consigned to Foster & Gardner at Mobile, Ala., marked [B]. Charges, $12.50. Total 23—marked by me—to be transported by Mobile and Ohio Railroad to Mobile, under stipulations and conditions contained in original receipts.

H. Hall, Station Agent."

Foster gave the station agent the usual memorandum required of shippers. With this receipt Foster again applied to Williams, Johnson & Co., drew his bill of exchange on Foster & Gardner for $2300, attached thereto said receipt; they discounted the bill at one per cent. and paid Foster the money. This was between four and five o'clock in the evening of the 30th of November. The same night Foster absconded, without paying for the cotton, and has never since been heard from. When Williams, Johnson & Co. discounted said bill, they made no inquiry, and had no knowledge of any fraud, or whether the cotton was paid for or not; nor from whom Foster had obtained the cotton, and had never seen or known of said dray receipts or of the order delivered by plaintiffs to Foster.

It was also shown that said defendants, when they gave said receipt attached to said bill of exchange, made no inquiry as to how Foster had obtained the cotton; that they had never seen and did not know of the order given Foster by plaintiffs, and were ignorant of any fraud on the part of Foster, or of any claim on the part of plaintiffs to the cotton.

It was shown by plaintiffs that before bringing this suit they demanded the cotton of said defendant in Mobile, while it still had it in possession, and proposed to pay the freight, but the railroad company refused to deliver it, and stated that it would not deliver it to any one but the person to whom it was consigned, or who held the receipts. The evidence tended to show that the company, on the receipt of the cotton, had paid the warehouse charges, amounting to $12.50, but there was no evidence that the plaintiffs knew this at the time the demand was made for the cotton, and the company did not claim to hold possession for these

charges, nor did it make it known at that time that it had paid them. Certain sections of the Code of Mississippi were introduced to show that the obtaining of goods under false pretences was a felony, and that bills of lading and railroad receipts were not negotiable.

It was shown that the draft was not accepted or paid by Foster & Gardner, and was still unpaid. This was substantially all the evidence, and the court charged the jury as follows: "If you believe from the evidence that the plaintiffs delivered the cotton to Foster, without any intention to transfer the title to him, but under a contract for the sale of the cotton at a future day, when, on examination, it should be satisfactory, when payment of the purchase money was to be made, then no title vested in him until such payment, and he acquired no title under such agreement, and could communicate none to Williams, Johnson & Co., and plaintiffs would be entitled to recover, unless you should find from the evidence that the acts and conduct of the plaintffs in the matter, were such as to indicate a waiver of their rights to the cotton, and were calculated to mislead and deceive Williams, Johnson & Co., and that they, (W., J. & Co.) under these circumstances, bought the bill in question, with the railroad receipt attached, for full value. If you find from the evidence, there was a custom of trade in Columbus, where this transaction took place, by which two days were allowed for the examination of cotton in lots of this number of bales, and that in accordance with such usage, title did not pass until the cotton was paid for, and that said cotton was sold in accordance with and in reference to such usage, then the payment of the purchase money was necessary, before the title passed to Foster, and he could confer none on Williams, Johnson & Co., and plaintiffs would be entitled to recover, unless you find from the evidence that the acts and conduct of the plaintiffs, in their transaction with Foster, and their manner of dealing with him were such as to reasonably mislead and deceive, and did mislead and deceive, Williams, Johnson & Co. in their dealing with the said Foster, without any fault or negligence on their part. If you believe from the evidence, the sale by the plaintiffs to Foster was to be a cash sale, in case the examination of the cotton was satisfactory, and that a certain time was given Foster to examine the cotton, and if satisfied to pay for it, and that the order for possession of the cotton was given only for the purpose of examining it, and not to confer any title or ownership on Foster; and if you further believe that said Foster, during the time allowed him for examination, and without paying for it, fraudulently disposed of the cotton, and ob-

tained an advance on it from Williams, Johnson & Co., and transferred to them the railroad receipt, without the knowledge or consent of plaintiffs, you must find for the plaintiffs, unless you find plaintiffs did some act calculated to deceive, and which did deceive, Williams, Johnson & Co., without fault or negligence on their part. A custom must be general and uniform; but it is not indispensable to its validity, that it should be universally acquiesced in."

The court then gave the following written charges, at the request of the railroad company:

"1. If the jury believe that the plaintiffs sold the cotton in question to Foster, and gave to him the order given in evidence, and if the cotton was placed by the warehousemen in possession of the railroad company, under and pursuant to the order, the railroad company was justified in presuming that Foster was the owner, and in giving its receipts to Foster, unless it is shown by the evidence that the railroad company knew, or had reason to believe, that the plaintiffs had not been paid; and if Williams, Johnson & Co., without knowing, or having reason from facts given *in evidence to believe*, that the cotton had not been purchased and paid for, bought the bill drawn by Foster with the railroad receipt attached in good faith, the plaintiff cannot recover.

"3. To constitute a usage of trade, there must be a mode of dealing in reference to the matter so generally adopted, and acted on, by those in the business to which the usage relates, as to justify the inference that the actors dealt in reference to it, and if they believe that in Columbus no fixed rule prevailed to the effect, that the cotton was not sold until paid for, but that the mode of dealing in this respect was one way or the other, indifferently, as parties elected, the plaintiff can claim nothing by virtue of any such supposed rule.

"4. If the jury believe that the order of plaintiff was calculated to induce the belief that the cotton was to be turned over for shipment on account of Foster, and if the railroad company, under such belief, and without knowledge or notice to the contrary, gave its receipt, or bill of lading, to Foster, and Williams, Johnson & Co., upon the faith of the shipment, and in ignorance of the fact that plaintiff had not been paid for the cotton, and in ignorance of any fact to create in their minds a doubt of such payment, bought the bill in question in good faith and for full value, and without notice, and took the bill of lading attached as security for the bill, plaintiff cannot recover.

"5. If the jury believe that the plaintiff and Foster so dealt in reference to the sale of the cotton, as to induce the belief that Foster was the owner of the cotton, and if under such

belief Williams. Johnson & Co. purchased the bill, with the railroad receipt attached, in good faith, for full value, and without notice or reason to suspect, plaintiffs can not recover.

"7. If the jury believe from the evidence that the delivery order given by plaintiff, was an order of final delivery, and that Williams, Johnson & Co. bought the bill in good faith, and for full value, with the railroad receipt attached, and without notice, plaintiff can not recover.

"8. To maintain this action, plaintiffs must show a right to the possession of the property at the time the suit is brought, and if under plaintiff's order the warehouse expenses were paid by the road, the plaintiff was not entitled to such possession, and can not recover, unless before suit brought plaintiff paid, or offered to pay, such expenses; and an offer merely to pay the freight of the road does not entitle them to maintain this suit.

"9. If the jury believe, from the evidence, that Leigh Bros. gave a delivery order in such form as reasonably misled their own warehousemen into supposing that it was a final delivery order for shipment on account of Foster, and that being so misled the warehousemen delivered the cotton to the railroad expressly to be shipped for account of Foster, and that Foster was in this way enabled to get possession of the railroad receipt, and with it deceived Williams, Johnson & Co. into believing that he had absolutely bought it, and received possession, and thereby induced them to part with their money *bona fide*, without notice of non-payment of purchase money, by drawing with bill of lading attached, defendant is entitled to a verdict.

"10. Whether plaintiff intended to waive his right to the cotton, is not the only question. The point is, Did plaintiffs or their agents do any thing to lead other persons to lay out their money in the reasonable belief that the plaintiffs had sold and absolutely delivered the cotton?"

These charges were separately excepted to, and are now assigned as error.

JOHN T. TAYLOR,. and BOYLES & OVERALL, for [appellant.—] There was no complete sale of the cotton. No title ever passed to Foster. It was an agreement to sell in case the purchaser was satisfied on examination, and the cash paid. It was to be a *cash sale*, and amounts to nothing until the cash is paid. Foster was informed of the rules of the board of trade, and he expressly made the agreement that the proposed sale should be made in reference to them ; and possession was given him *only* for the purpose of examination; and

[Leigh Bros. v. Mobile & Ohio R. R. Co.]

it makes no difference, on this point, whether the rules of the board of trade were a valid custom or not; the parties expressly agreed that the title should remain in the plaintiffs until the cotton was paid for.—See 117 Mass. 23; 3 Otto, 583; 55 N. Y. 456; 58 N. Y. 73; 40 N. Y. 314; 5 Gray, 306; 24 Conn. 427; Benjamin on Sales, 302–3; 15 Am. Reports, 697. Nothing done or said by plaintiff, authorized any one to suppose that they had parted with their title. The order to the warehousemen was simply to deliver the cotton to the railroad company. It was merely a change of the location; the legal effect of this order was, that wherever the cotton was sent it should remain the cotton of the plaintiffs. It did not even vest Foster with the possession. No authority was given in that order to send the cotton any where as *Foster's cotton*. This order was consistent with the terms of the contract of sale, and that the warehousemen misunderstood it is no fault of the plaintiff. The statement in it, that Foster would pay the storage, did not authorize the warehousemen, or the railroad company, to suppose the cotton was Foster's. Besides, neither the railroad company nor Williams, Johnson & Co. ever saw the order, and hence neither of them could have been influenced by any thing contained in it; they dealt with Foster at their own peril and must take the consequences of their over-confidence in him. The charges given at the request of the railroad company are clearly erroneous; they left the construction of the order to the jury, while it is evidently the duty of the court to construe all written instruments. The eighth charge was clearly wrong. It affirms that, to maintain this action, plaintiffs must have paid or offered to pay a charge on the cotton which they did not know existed, and of which nobody but the company knew any thing. Besides, the company never informed plaintiffs that such a charge existed, and they can not set up such a claim; unless they made it known and refused the demand for possession on that ground.—See 10 Ala. 588. There was no plea setting up this claim or defense. What amounts to the general issue was pleaded, and this question was not an issue to be tried. So, where the defendant pleads and sets up title on the merits, no demand at all is necessary to be proved.—1 Brick. Dig. 575, §§ 73, 75, 76; 13 Ala. 370; 24 Ala. 184. The railroad company based their refusal on another and essentially different ground, and they can not seek to evade the consequences of their refusal by setting up rights which, if they existed at all, were known only to them and which they did not assert. It is evident these charges misled the jury and caused a wrong verdict.

R. H., R. I. & G. L. Smith, *contra*.—It is clear that if the plaintiffs so acted in regard to the cotton, as to induce others to lay out their money under the honest belief that it was the property of Foster, they can not recover. This proposition is settled by *Sumner v. Woods*, 52 Ala. 94.—See 1 Selden, 41; 14 Searg. & Rawle, 214; 4 Mass. 403; 6 John. Chy. 437; 3 Duer, 341. Plaintiffs, by their acts and the acts of their authorized agents, (book-keeper and warehouseman), made admissions, upon the faith of which Williams, Johnson & Co. have acted *bona fide* and without notice, and laid out their money, and the plaintiffs are concluded by these admissions.—21 Ala. 424; Benj. on Sales, 721; 19 Ala. 436; 16 Ala. 175; 22 Ala. 548; 1 Greenl. Ev. § 207; Herman on Estoppel, 337; Story on Sales, § 313, p. 343-5, and authorities in note 3. Conceding that the sale was in its inception conditional, and did not pass any title *suo proprio vigore*, still plaintiffs by their acts gave Foster the *indicia* of property, and thereby enabled him to deceive Williams, Johnson & Co. into trading with him on the faith of such ownership. Under these facts, the plaintiffs could not recover, and the charge of the court left these facts fairly to the jury. The warehouseman was the agent of plaintiff, first, to keep the cotton, and second, to deliver it pursuant to their order. If the warehouseman was plaintiff's agent, it was his duty to construe the order given by plaintiffs, and in the absence of plain words to the contrary, the railroad company was justified in accepting the construction of the warehouseman. The order says in plain words, deliver to the M. & O. R. R. The order does not say for whom, but it connects but one person with the paper, and that was A. J. Foster. It directs Foster to exercise an act of ownership, viz: pay storage. The railroad company could draw but one inference, viz: that it was to be delivered to the party who alone was known to it as having any power to exercise any act of ownership, and on this ground it was justified in giving its railroad receipt to Foster. This power to possess himself of the *indicia* of ownership, was given to Foster by the appellants, and they can not complain if he used it to their damage. They enabled Foster to deceive Williams, Johnson & Co., and as against them they can assert no claim to the property.

It is claimed that the charges given by the court are erroneous, because they leave to the jury the construction of the order given by plaintiff, while it was the duty of the court to have construed it. Had appellants asked a charge construing the order, which asserted a proper construction, it would have been error for the court to have refused it; but it surely will not be insisted that a court errs and is subject

to reversal every time it omits a charge, which, if given, would have been correct. It is the duty of the court to construe any written instrument when called on by either party to do so ; but it certainly commits no error when, in the absence of any request, it fails to do so.

BRICKELL, C. J.—It is not necessary to inquire whether the rules of the board of trade, at Columbus, had existed so long, were so generally known, and acted on, that they would be regarded as a custom or usage, entering into and forming a part of contracts for the sale of cotton there made, which were not in stipulation inconsistent with them. Of the character of these rules, Foster was informed by the plaintiffs, and that the proposed sale, or agreement to sell, made with him, was made in reference, and subject to them, and that while he would be allowed to examine, and, if he desired, to re-weigh the cotton, the title would not pass, the sale was not complete, and he could not ship or remove it, until the price was paid. Without dissent, Foster proceeded with the agreement, and these rules thus become parts of it, as completely as if the agreement had been reduced to writing, and they had been expressed as terms of it. To constitute a *sale*, the parties must mutually assent, that the property, absolute or general, in the thing sold, shall pass from the vendor to the vendee. There may be propositions which, when accepted and complied with, will ripen into a contract of sale ; or, there may be agreements for a sale in the future ; or, there may be *executory contracts* for sale, but these do not confer the rights, or impose the obligations, which arise from a contract of sale.—Pars. Mer. Law, 41 ; *Chamberlain v. Smith*, 44 Penn. St. 431. By the agreement made with Foster, neither the property, nor the right of possession, passed to him ; and if, during the time allowed him for examination, and re-weighing, if he desired to re-weigh, or at any time before the payment of the price, the cotton had been lost, or from any cause had perished, the loss would have fallen, not on him, but the plaintiffs. The agreement conferred on Foster a right to the inspection and examination, and re-weighing of the cotton, to ascertain if, in quality and quantity, it corresponded with the representations of the plaintiffs, if it was in fact the thing they proposed selling, and he proposed purchasing. It conferred on him, also, the right, on paying or tendering the price, within the time allowed by the rules of the board of trade, to demand of the plaintiffs a transfer of the ownership and possession. It conferred on the plaintiffs the right to demand the inspection and examination, and re-weighing, if that was desired, and the payment of the

price, within the time prescribed. A breach of the promise by either party, the other being willing and ready to perform on his part, would have been ground of an action for the recovery of damages. The contract was not, therefore, a *sale*, operating, and intended to operate a change of property, but an *executory agreement for a sale*.

The order given Foster by the plaintiffs, directing the warehousemen with whom the cotton was stored, to deliver it to the appellee, did not change the character of the agreement—did not convert it, from a mere *executory bargain*, into a *sale*, as between the plaintiffs and Foster. If the order had authorized the warehousemen to deliver the cotton to Foster, instead of to the appellee, and had been absolute, without qualification or condition in its terms, whether it would have operated a transfer of the property to him, would depend entirely on the intention with which it was given and received. This intention, as deduced from the agreement between the parties, and the circumstances attending the making of the order, would have controlled its operation.—*Magee v. Billingsley*, 3 Ala. 698; *Bates v. Simpson*, 4 Ala. 305. The agreement between the plaintiffs and Foster, and the circumstances attending the execution of the order, show conclusively that the intention was, not a transfer of the property, nor entrusting to him possession of the cotton, but a mere delivery of it, at the place he selected as most convenient for inspection and examination. It gave him no right or interest in the cotton, distinct or different from that acquired by the agreement, and no authority or power over it, other than that he could have exercised if it had remained in the warehouse. The order is not, however, for the delivery of the cotton to Foster. It is in keeping with the agreement the plaintiffs made with him, by which they retained dominion, property and possession of the cotton, and yet afforded him the opportunity of inspection and examination. The delivery authorized, is to the appellee, and if accepted, the appellee thereby becomes the bailee of the plaintiffs, and not of Foster. The only connection the order indicates that Foster had with the cotton, was to pay the storage to the warehousemen. This, at best, is a very equivocal indication of connection with it; and cannot, with any propriety, be regarded as an *indicium* of ownership, or of authority over the cotton, when found in an order which does not indicate any intent on the part of the plaintiffs to part with the property or the possession, and expressly directs the transfer of custody and possession from a warehouseman, not to Foster, but to another bailee, a common carrier. There is not a word, other than the statement that Foster would pay the storage, to be found in

the order, which indicates that he has the slightest connection with the cotton. It seems too plain for controversy, when the order is taken, as it must be, in connection with the agreement between the plaintiffs and Foster, and with the circumstances attendant upon its making, that it must be regarded, as the parties intended it, not as changing the ownership or possession of the cotton, but merely as an authority to the warehousemen to transfer it to the warehouse, to the depot, or platform of the appellee. As between Foster and the plaintiffs, the property and possession of the cotton was not changed. Foster acquired no interest in it; his right was by payment of the price, within the time appointed, to acquire property in and possession of it. If the cotton was in his possession, there can be no doubt the plaintiffs would be entitled to recover it from him; or, if in the possession of the appellee, as his bailee, the rights of third persons, not having intervened, the duty of the appellee to surrender it to the plaintiffs, or on refusal, the right of recovery of the plaintiffs would be clear and undoubted. Whatever may have been the doubt, at one time, it is now well settled that the right of the true owner, to recover his property from a bailee, is co-extensive with that he would have if the possession had continued in the bailor. Each and both must yield to the paramount title.—The "Idaho," 3 Otto. (93 U. S.) 575; *Croswell v. Lehman, Durr & Co.*, 54 Ala. 363.

The general rule of law is, that in the absence of authority, or of property, a sale, or a pledge of chattels, confers no title, even when the person making it is in possession, and the person to whom it is made pays a valuable consideration or advances money in good faith, and without notice of the right or title of the true owner.—1 Smith Lead. Cases (5th Am. ed.), 892–3; Benjamin on Sales (1st Am. ed.), 4; *Banard v. Campbell*, 55 N. Y. 456; *Saltus v. Everett*, 20 Wend. 267; *Stanley v. Gaylord*, 1 Cush. 536. The rule is embraced in the maxim: *Nemo plus juris ad alium transferre potest quam ipse habet—Nemo dat quod non habet.* There are cases recognized as exceptions to the rule.

The first of these, material to be noticed under the facts of this case, and the instructions to the jury, is that of an immediate sale, followed by possession in the vendee, with a condition annexed that, if he fails at a future day to pay the price, the vendor may reclaim the goods—or an immediate sale, followed by possession in the vendee, with an agreement that the title shall remain in the vendor until the price is paid. Not, perhaps, following the current of authority, this court has, in this class of cases, held, that a purchaser

from the vendee, while in possession, paying a valuable consideration, and without notice of the condition annexed, or of the agreement, would acquire a title that would prevail over the right of the vendor. The condition, or the agreement, is valid and operative, as between the vendor and vendee, and would be enforced if the rights of a subsequent *bona fide* purchaser had not intervened.—*Sumner v. Woods*, 52 Ala. 94; *Dudley v. Abner, ib.* 572. This class of cases is wholly unlike the present. Here there is no contract of *sale*, no transfer of property or of possession. There is, as we have said, at most, but an *executory agreement* for a sale. The reason lying at the foundation of the decisions to which we have referred is, that the transaction between the parties is, in effect, a mortgage—the reservation of the condition, or the stipulation, that the title should remain in the vendor, being intended as a security for the payment of the price. The recognition of such a reservation, or of such a stipulation, as superior to the right of the subsequent innocent purchaser, would offend the policy of our registration laws, and open a door for the perpetration of frauds. The exception in itself imports that there has been a *sale*, and a change of possession—a delivery by the vendor to the vendee, as a completion of the sale, putting the thing sold at the risk of the vendee.—*Lehigh Co. v. Field*, 8 Watts & Serg. 232; *Lester v. McDowell*, 18 Penn. St. 91; *Chamberlain v. Smith*, 44 Penn. St. 431.

Another class of cases, said to be exceptions to the general rule, that "no one can transfer to another a better title than he has himself," is where the owner, *with the intention of sale*, parts with the property, though under such circumstances of fraud as would authorize him to reclaim it from the vendee. In this class of cases it is very accurately said: "We must distinguish whether the facts show a *sale* to the party guilty of the fraud, or a mere delivery of the goods into his possession, induced by fraudulent devices on his part. In other words, we must ask whether the owner intended to transfer both the property in and the possession of the goods to the person guilty of the fraud, or to deliver nothing more than the bare possession. In the former case there is a contract of sale, however fraudulent the device, and the property passes; but not in the latter cases."—Benjamin on Sales (1st Am. ed.), 319. This case certainly does not fall within the exception. The plaintiffs did not part, or intend to part, with the property in the cotton, until the payment of the price; and Foster did not contract for it until he made the payment—until that event, property and possession remained with the plaintiffs. If the order to the

warehouseman could be regarded as an authority to Foster to take possession, it was a possession for the mere purpose of examination and re-weighing; and it was obtained by fraud. This mere possession clothed him with no right or interest in the cotton, which he could transfer to another. If there had been a *sale*, an intentional transfer of the property in the cotton to him, though it was induced by fraud, the right of a *bona fide* purchaser from him would prevail, because he was clothed with the title. True, the contract would have been voidable at the election of the plaintiffs— it would not have been void. The plaintiffs could have affirmed it, on discovery of the fraud, and have pursued him for the price; or, they could have claimed its rescision, and pursued the cotton. Until they disaffirmed, and claimed the rescission, the title of course would have remained in Foster; and if, in the meantime, he had sold or pledged to one innocent and ignorant of the fraud, the title would pass to him. *Hoffman v. Noble*, 6 Metc. 73; *Moody v. Blake*, 17 Mass. 23.

Another class of cases forming an exception to the general rule, is, when the owner, by his own act or consent, has given another such evidence of the right to sell, or otherwise dispose of his goods, as according to the customs of trade, or the common understanding of the world, usually accompanied the authority of sale, or of disposition. Then, if the person entrusted with the possession of the goods, and with the *indicia* of ownership, or of authority to sell, or otherwise dispose of them, in violation of his duty to the owner, sells to an innocent purchaser, the sale will prevail against the right of the owner. He ought to bear the loss which may follow from his misplaced confidence, rather than the *bona fide* purchaser, who relied on the evidence of property, or of authority with which he clothed the possessor. It is within this exception this case is supposed to fall. The argument is, the order given by the plaintiffs to the warehousemen indicated that Foster had the ownership of the cotton, or, at least, authority to control and direct its shipment. By the order, the warehousemen were induced to deliver the cotton to the appellee, as the property, or on account of Foster; and the appellee was induced to give him the bill of lading, which Williams, Johnson & Co. accepted as security for the bill of exchange discounted by them. This exception does not arise merely because the true owner entrusts another with the possession of his goods. Possession is *prima facie* evidence of the ownership of all species of personal property. It is but *prima facie*, and whoever deals alone on the faith of it must accept it as such, and in subordination to the paramount title, which would prevail over it, if the

[Leigh Bros. v. Mobile & Ohio R. R. Co.]

possession was not changed by the transaction into which he enters. If this was not true, a felon acquiring possession by theft, could, by a sale to an innocent purchaser, divest the true owner of his property. A naked bailee, entrusted with possession, could dispose of goods to the prejudice of his principal. A case does not fall within the exception unless the owner confers on the vendor *other evidence of ownership, or of authority to dispose of the goods, than mere possession.—McMahon v. Sloan,* 12 Penn. St. 229. The case of *Andrew v. Dietrich,* 14 Wend. 31, is an illustration. An auctioneer who had dealt with the tenant in possession of a house in which the carpets were down, under the belief that he was the owner of the carpets, and had advanced money on the faith of his ownership, acquired no right or title as against the true owner, who had delivered them to the tenant, under an executory contract for sale at so much per yard. In *Covill v. Hill,* 4 Denio, 323, the principle is affirmed that the mere possession of goods, without some other evidence of property, or of authority from the owner to sell, will not enable the possessor to transfer a better title than he has himself. The plaintiff was the owner of a lot of lumber lying on the bank of the canal, which he agreed one Potter might ship in his, the plaintiff's name, to the defendants at Albany to sell, and that when sold, the plaintiff should receive a certain sum per thousand feet, and Potter the remainder, if any, of the proceeds of sale—the title and possession to remain in the plaintiff till he was fully paid. The transaction between the plaintiff and Potter was treated as a bailment, and it was held the defendants acquired no title by the purchase from Potter. In *Saltus v. Everett,* 20 Wend. 267, there was a sale of lead by a person in possession, having a bill of lading indorsed in blank, and other written evidence of property he had fraudulently obtained, and the sale was held inoperative to divest the true owner of his title. In all cases, which have been deemed to fall within this exception, the owner has done some act, other than parting with possession, of a nature to mislead persons as to the title. The case of *Pickering v. Busk,* 15 East, 38, has been considered as carrying the exception to its limits. There the owner of hemp lying at the wharf had it transferred on the wharfinger's books into the name of a broker whose business was that of buying and selling hemp; and though he gave the broker no authority to sell, it was held, a sale by him to an innocent purchaser passed the title. Lord Ellenborough said: "Strangers can only look to the acts of the parties, and the external *indicia* of property, and not the private communications which may pass between a principal

and his broker ; and if a person authorize another to assume the apparent right of disposing of his property in the ordinary course of trade, it must be presumed the apparent authority is the real authority."

The order to the warehousemen is the only evidence of ownership, or of a right to possession, which Foster had or the plaintiffs conferred. This order cannot be regarded as an evidence of the transfer to him of either possession or of property. It was not calculated to induce others to deal with him as the owner, or as having authority to dispose of the cotton. By it the plaintiffs, in effect, assert their ownership and authority, and designate the appellee, not Foster, as the person to whom possession or custody of the cotton was to be delivered. The order does state the ship mark of the cotton, and this, with its delivery to the appellee, may have indicated that transportation by the appellee was intended. If it indicates that intention, there is nothing to indicate that the plaintiffs did not intend the shipment should be on their own account, or that they would not give instructions, subsequently, as to the consignee, the place of destination, or on whose account, and as whose property it was to be transported. There is no indication that Foster had, in these respects, the slightest authority. It is not material what construction the warehousemen or the appellee may have placed on the order. If they construed it as an evidence of a transfer of property to Foster, or as conferring on him authority, they adopted that construction at their own peril ; and their misconstructions can not prejudice the plaintiffs. The expression that Foster would pay the storage is, as we have said, to say the least of it, very equivocal as indicating that he had any connection with the cotton. If this expression created a conjecture that he was connected with it, its uncertainty ought to have put the warehousemen and the appellee on the inquiry, and inquiry would have rendered it impossible that they should have been misled. Not inquiring, when ordinary prudence would have suggested inquiry, they must take the consequences of their dealing with one who had no authority over the cotton. Nor have Williams, Johnson & Co. acquired any right in or to the cotton. The bill of lading erroneously given Foster by the appellee, cannot deprive the plaintiffs of their property. Its transfer by indorsement would have passed no more than the right and title of Foster, if any he had, and if its transfer by delivery passed an equity courts of law would recognize and protect, it is an equity resting only on that right and title, not on the property of the plaintiffs.—*Saltus v. Everett*, 20 Wend. 267.

[Schuessler v. Hatchett et al.]

When the cotton was demanded of the appellee, the plaintiff tendered payment of the freight, but not of storage, which it seems the appellee had paid the warehousemen. The appellee did not inform the plaintiffs of the payment of the storage, but placed its refusal to surrender possession on no other ground than that it would surrender only to the consignees or the person holding the receipt given for its transportation. We do not intend to express an opinion on the right of the appellee, in any event, to have demanded of the plaintiffs payment of freight or storage, as the condition on which they would surrender the cotton to them. If the appellee had that right, it ought to have been asserted when the demand was made. Not then asserting it, but placing their refusal on the sole ground that the plaintiffs were not the consignees, or had not possession of the receipt for transportation, they must be deemed to have waived it. They cannot now defeat the suit they have compelled, by asserting a lien the plaintiffs could have removed, if knowledge of it had not been withheld from them.—*Spence v. McMillan*, 10 Ala. 5??.

It is obvious from what we have said, that the instruction numbered three, is abstract, if it asserts the law correctly, and that the remaining instructions are erroneous statements of the law applicable to the facts shown by the bill of exceptions.

The judgment must be reversed, and the cause remanded.