ALEXANDER L. THORNE *et al.*

*v.*

L. M. PRENTISS.

| 83 | 99 |
| 52a | 93 |
| 83 | 99 |
| 84a | 399 |

| 83 | 99 |
| 197 | ²605 |

1. CONTRACT—*when construed by rules of the board of trade.* All contracts for sale made on 'Change by members of the board of trade to another member, with reference to the by-laws and rules of the board, must be construed as if those rules were expressly made a part of the contract; but members of that board may, by contract on 'Change or elsewhere, bind themselves beyond and independent of these rules. Where the sale is made at its rooms, in the absence of proof to the contrary, it will be presumed to have been made with reference to these rules.

2. FRAUD AND DECEIT—*when action lies for.* Notwithstanding the rules of the board of trade of the city of Chicago, in respect to sales, if the seller makes a distinct assertion of the quality or condition of the article sold, whether it amounts to a warranty or not, which he knows or should know is untrue, with the view of inducing another to buy, and that other relies upon that assertion, and believes it to be true, and, by reason thereof, does buy, and damage ensues to him, he may maintain an action for deceit, notwithstanding he may also have procured an inspection of the article purchased.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. MONROE, BISBEE & BALL, for the appellants.

Messrs. HAWES & LAWRENCE, for the appellee.

·Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was an action on the case, for deceit, in the sale of 3000 pieces of smoked hams.

The judgment was for the plaintiff, for $2000, and the defendants appeal therefrom to this court.

The question first arising is, must the sale be considered as governed by the rules of the board of trade?

It is in evidence that the parties were all members of that board; that the sale occurred during business hours, at its rooms; that "the board has rules, in the nature of by-laws, by

which a committee of five is appointed on provision inspection; and also that provision inspectors are appointed, from whose decision an appeal lies to the committee on provision inspection." Sections 6 and 10, of rule 15, relative to sale of provisions, are as follows:

"SEC. 6. Buyers of provisions on contracts, at buyer's option, shall have the right to inspect before the day of delivery, provided they send an inspector in time to allow the inspection to be completed before the proposed delivery, but, failing to do so, the seller shall have the privilege of having the property inspected, the cost to be paid by the buyer."

"SEC. 10. In sales of 'fully cured' meats, or to be 'fully cured' and delivered at any specified time, the seller must deliver in good faith, according to contract, the inspector to be the judge, who shall always be informed of the conditions of the contract before proceeding to inspect. Where sales of dry-salted meats are made without other specifications, it shall be considered that the sale contemplates meats 'fully cured,' the inspector to be the judge."

Another rule requires inspectors to issue a certificate, and prescribes what it shall state, and the effect thereof, etc.

We do not entertain any doubt but that all contracts of sale, within the contemplation of these rules, must be construed as if the rules were expressly made a part of the contract; but there is nothing, to which our attention has been directed, in the charter of the board of trade, and certainly nothing in the general law, which prohibits members of that board from contracting "on 'Change," or elsewhere, so as to bind themselves to obligations beyond and independently of these rules. The only difficulty that can arise in this respect must be in determining whether the parties intended their contract should be construed with reference to the rules of the board of trade, or that obligations were assumed outside of those rules. Sales made at its rooms, in the absence of anything indicating to the contrary, would, of course, be presumed to have been made with reference to its rules, and the parties

would be bound by them. In such cases, the purchaser is presumed to rely on the certificate of inspection as a protection against imposition. But even then, we apprehend, an action for deceit might lie against the seller by making proof of a fraudulent inspection made by his procurement. Whether this be true or not, however, we are clearly of opinion that, where a seller makes a distinct assertion of the quality or condition of an article, whether it amount to a warranty or not, which he knows or should know is untrue, with the view of inducing another to buy, and that other relies upon that assertion, and believes it to be true, and, by reason thereof, does buy, and damage ensues to him therefrom, he may maintain an action for deceit, notwithstanding he may have also procured an inspection of the article purchased. The reason is obvious. The false assertion of the seller, and not the inspection of the article, induced the purchaser to buy, and was, therefore, the moving cause to the loss sustained. The inquiry in such cases may be shortly stated thus: Upon what did the parties intend to rely to determine the soundness or quality of the goods? Was it the assertion of the seller, the judgment of the purchaser, or the inspection under the rules of the board of trade—the presumption being, as before observed, in the absence of anything showing the contrary, that it was the latter?

The evidence in the present case is conflicting, and we are not free from doubt, after a careful examination of the record, that a different conclusion from that reached by the jury would not have been more satisfactory to us. Still, we do not entertain that degree of confidence that the preponderance of the evidence is against the finding, that we must have, to justify us in interfering with the verdict.

The evidence, beyond question, preponderates that the hams were of a very inferior quality, and badly damaged, and worth but little, if anything, for the purposes of trade. The evidence, however, with regard to the terms of the sale, and the defendants' knowledge of the condition of the hams, is not so satisfactory.

The defendants were curers of hams and other hog product, in Chicago, purchasing their hams for that purpose from the different packers. They seem to have been eminently successful in this line, doing, as the evidence shows, not only the largest business of this kind done in Chicago, but probably the largest done anywhere. They used two brands which they placed on the meats cured by them, one of an inferior grade to the other, and both were very popular in the market. The superior brand was "Thorne & Co.," and the inferior brand "Hugh J. Brady & Co."

At the end of the packing season of 1872–3 they had on hand a quantity of second grade hams, which, as they phrase it, "ran light," averaging only from thirteen to fourteen pounds; and, to increase the average, they purchased from a packing house an additional lot of inferior or second grade of hams but of greater weight, and added them to the lot on hand. After pickling them by their process, they, contrary to their usual custom, determined to have them smoked on their own account, and, accordingly, sent them to the smoking establishment of Dupee, where they were properly smoked.

Plaintiff was a large dealer in provisions in Chicago, selling both to wholesale and retail dealers, and, sometime in June, 1873, meeting with the defendants on 'Change, he entered into negotiations with them for the purchase of 3000 of their smoked hams. He says, positively, he was informed by the defendants that the hams were strictly first class and all right, one of the defendants using the language, in reply to the inquiry as to their quality, "they are very fine; none nicer in the world; our hams are very fine, as every body knows." Plaintiff was informed the hams had been smoked by Dupee, and that they were then in his warehouse. Plaintiff says, he told defendants he guaranteed every ham that he sold, and that he bought and sold nothing but strictly first class sugar-cured hams; to which the defendants responded, their hams were "strictly first class and all right." Plaintiff further says, in the conversation one of the defendants observed to him, speaking of the hams, "I suppose you will put your own

brand on." To which he replied, that he should buy nothing that he would not put his own brand on, but that he supposed that could be optional with himself. The defendant engaged in the conversation, then said they had never tried putting up bagged hams before, and had no brand. Plaintiff replied: "I can have your brand on them if I want, I suppose, Mr. Thorne;" and he answered, "oh yes, if you will be at your own expense." Plaintiff further says, he purchased solely on defendants' representations. Although plaintiff had the hams inspected, he was not present at the inspection, and there is no pretense that he had other knowledge of them, at the time of his purchase, than what he obtained from the defendants.

But the defendants, in giving evidence, directly contradict the plaintiff on every material point. They deny that they told him that the hams were first class; but say, although they told him they thought they were good, they also told him they were second class, and that they, being requested by him, expressly refused to guarantee them. They also say they informed him that they sold under the rules of the board of trade and subject to board of trade inspection. They deny that they consented that he might place their brand on the hams, but say they told him he might use their brand of "Hugh J. Brady," if he chose.

Several witnesses testified to remarks made by the defendants, at different periods of time after the sale, to the effect that the hams they sold defendant were first class. The strongest evidence, however, corroborative of the plaintiff, is this: Plaintiff sold a car-load of the hams to Franklin McVeagh & Co., who shipped them for sale to Salt Lake City, in connection with another lot of hams which he purchased from the defendants, and which also proved to be unsalable, and were the subject of litigation in *Thorne et al.* v. *McVeagh et al.* 75 Ill. 81. Before shipping this car-load, plaintiff, for reasons which he explains, and which are unimportant here, placed the brand of Gifford & Co. on the hams. The parties at Salt Lake ordering hams, required those of the brand of Thorne & Co., and on the car's arrival there notice was given by them

that this car-load was not of the proper brand.   On receiving this notice the plaintiff wrote this:

" This is to certify that the car of canvassed hams shipped to H. B. Clawson, Salt Lake, on the 11th inst., containing 11.379 pieces, 20,826 pounds, were from a lot of our own regular cure, and sold to L. M. Prentiss, June 5, 1873.   It was made optional with him to use the brand of Thorne & Co. or that of his own."

He also wrote the following beneath it:

" THORNE & Co., Gents—If I state the above correctly, will you please put your signature to it?   The party to whom I sold, it seems, had sold them specifying your hams and brand, though I was not informed of the fact at the time.

"Respectfully yours,          L. M. PRENTISS."

Both were inclosed in an envelope and left at defendants' hotel for them.   The certificate was, shortly thereafter, signed by one of the defendants, in the other's presence, and handed by him to the plaintiff.   Defendants do not deny the execution of this certificate, but attempt to obviate its effect by the explanation that it was done hastily, and through an over-anxiety to aid the plaintiff.   The explanation is not satisfactory.   There was evidently plenty of time for reflection, and the note did not ask the signature as a matter of favor, but as a matter of right.   It shows that the certificate purports to state what the contract was, and the defendants' signature to the certificate is a deliberate admission that the hams were to have the brand of Thorne & Co., if plaintiff desired it, which brand was only placed on their first class hams.

It is hardly reasonable to suppose, when the transaction was so recent, that plaintiff would have had the effrontery to have made a request for a certificate of a matter relating to the sale, which he knew to be false, or that the defendants would have complied with such a request, which they must have known might somewhat involve their reputations, if they had felt under no obligation to do so.

Assuming the preponderance of the evidence to be with

the plaintiff, in regard to the terms of the sale, but little need be said upon the remaining question. Even the defendants, themselves, do not pretend that the hams were first class. They admit they were rejected, in assorting their hams, from their first class, so far as those they originally had were concerned, and those they purchased to be added to them were purchased as second class hams. Much of the evidence tends to show that they were so notoriously inferior and unsound that it would seem the defendants must have known they were very inferior, even as second grade hams. One witness, who was familiar with their smoking at Dupee's, says, " they stunk," and he is, to some degree, corroborated by a witness who examined them after the shipment of the car-load to Salt Lake, who says that, in some instances, there was yellow matter near the bone which would run out on the ham being opened. Dupee, and one or more witnesses beside, say they were a rejected lot of hams; and he further says, one of the defendants boasted of the smallness of the price which the hams had cost, and how much they expected to make out of them. If these things are true, and we can not say the jury were authorized to find they were not, the defendants were guilty of deceit if they represented them to be good second rate hams.

Our attention is called to no error of law in the ruling of the court below, and we are of opinion there is no substantial error in the record.

The judgment is affirmed.

*Judgment affirmed.*