### DILLARD and another *v.* PATON and others.

*(Circuit Court, W. D. Tennessee.* March 15, 1884.)

**1. CONTRACTS—SALE—EXCHANGE ASSOCIATIONS—RULES AND REGULATIONS—EFFECT OF NON-OBSERVANCE.**

Where merchants form voluntary associations "to establish just and equitable principles, uniform usages, rules, and regulations, which shall govern all transactions" between the members, parties dealing with each other, who are members, make the rules and regulations a part of their contract, and the courts will enforce them as such; but this only when they are observed by the members involved in the controversy; for the habitual non-observance by them in their dealings with each other will abrogate the particular rule violated, and relegate the contract to the ordinary rules of law governing it.

**2. SAME—COTTON EXCHANGE OF MEMPHIS—RULE 9—RISK OF LOSS BY FIRE.**

Where two members of the Cotton Exchange of Memphis, in their dealings with each other, for a series of years paid no attention on either side to a rule of the exchange which provided that delivery of cotton should not be considered final until the cotton was paid for, the contract involved in this suit should not be governed by the rule of the exchange, but by the general law. Where, therefore, a sale of 270 bales was made by sample, an order given by the seller to the warehouseman to deliver to the buyer, the warehouseman and the buyer weighed the cotton, the buyer sampled it, approved 268 bales, and rejected two, put his "class" and "shipping" marks upon it, and gave written directions to his drayman to remove it from the shed, *held*, that the title passed to the buyer when these things were done, and a loss by fire before removal from the warehouse was his loss, although the cotton had not, at the time of the fire, been actually paid for.

**3. SAME—CONSTRUCTION OF THE RULE—WAIVER.**

Where the rule of the Cotton Exchange of Memphis provided "all cotton shall be received within five working days from date of sale. The weighing and examining of cotton shall constitute a confirmation of sale, but delivery shall not be considered final until paid for,—the factor's policy of insurance to cover until delivered and paid for; payment being considered final act of delivery,"—*it seems* that a transaction under this rule is not an executory agreement to sell when payment is made, but that it is mere stipulation for the security of the seller, which enables him at his option to refuse to part with the possession until payment is made. But, whatever be the proper construction of the rule, where parties by an habitual course of dealing with each other had wholly disregarded it on both sides, and the seller in the particular transaction, as in all others, delivered unconditionally, and without restraint as to possession and use, and manifested no concern about securing payment through the rule, *held*, that this amounts to waiver by the seller of a stipulation solely for his benefit, and the risk of loss by fire passed with the title to the buyer on actual delivery to him. This waiver by the seller need not be in express terms, but may be fairly inferred from his conduct and acts.

FINDING OF FACTS.

This case, by stipulation of the parties under the statute, was submitted to the court without a jury. The court found the following to be the material facts:

I. The plaintiffs and defendants are members of the Memphis Cotton Exchange, an incorporated association, the purposes of which are thus described by its constitution:

"ARTICLE II.—PURPOSES.

"Section 1. The purposes of this association shall be to provide and maintain suitable rooms for a cotton exchange in the city of Memphis; to adjust controversies between members; to establish just and equitable principles, uniform usages, rules, and regulations, and standards for classifications, which shall govern all transactions connected with the cotton trade; to acquire, preserve, and disseminate information connected therewith; to decrease the risks incident thereto; and, generally, to promote the interests of the trade, and increase the facilities and the amount of the cotton business in the city of Memphis."

II. Among other things, not necessary to mention, the constitution also contains the following:

"ARTICLE VIII.—DUTIES OF MEMBERS.

"Section 1. Every member, upon admission, pledges himself to abide by the constitution, and also by all by-laws, rules, and regulations of the exchange."

III. The rules and regulations for the sale and transfer of cotton prescribed by the association are as follows:

"1. All resampling, or examination by boring, shall be performed after cotton shall have been weighed.

"2. All cotton must be examined and received by the purchaser before removal from its place of storage.

"3. The seller of cotton is entitled to his samples, but, when required by the buyer, shall allow him to take them to his office for the purpose of comparison, and when that is done shall return them, and a failure to do so will forfeit his right in the future to remove them from the office of the seller.

"4. Three hundred pounds shall constitute the minimum weight of a merchantable bale of cotton, and the buyer shall have the right to reject all bales below that weight; but if received an allowance of four dollars per bale shall be made to the buyer.

"5. Six ties only shall be permitted on each bale, unless an allowance is made of two pounds for every tie above that number.

"6. All seedy, mixed, fraudulently packed, and damaged cotton may be rejected, and must be done at its relative value in the list purchased; but the grade of the cotton by marks shall be given to the buyer at the time of sale, or before the day of delivery, if required by him, and cotton sold by samples must be delivered accordingly, unless rejected for causes above stated.

"7. The practice of examination by boring cotton, which prevails in this market, before passing of same, is understood to be the rule as to the manner of receiving, and relieves the seller from any liability for reclamation on mixed, fraudulently packed, or damaged cotton.

"8. All cotton shall be understood to be in good order; but if not, it shall be repaired within twenty-four hours from the time of delivery, and if not done within that time the necessary repairs may be made by the buyer at

the expense of the seller. No claims for repairs shall be allowed after the removal of cotton from its place of storage.

"9. All cotton shall be received within five working days from date of sale. The weighing and examining of cotton shall constitute a confirmation of sale, but delivery shall not be considered final until paid for. The factor's policy of insurance to cover until delivered and paid for; payment being considered final act of delivery.

"10. No order for the delivery of cotton is transferable without the knowledge and consent of the seller."

IV. When rule 9 of the cotton exchange was under consideration by the association it did not contain the last clause, viz., "payment being considered the final act of delivery." But a resolution was adopted appointing a committee to confer with the board of underwriters "to gain information regarding the insurance of cotton under process of delivery," and upon such conference a report was made that "after a lengthy discussion as to the indorsement and acceptance of rule 9 by the board of underwriters," a committee was appointed by that body to meet the directory of the exchange, "in order that rule 9 may be so amended, if thought proper, as to harmonize the different views." Whereupon the matter was discussed between the directors and the underwriters' committee, and resulted in adding the above clause to the rule, its acceptance by the underwriters, and at the same time the adoption by them of the following resolution: "Resolved, that our policies on cotton in sheds as now written provide all the security to the assured which they require, therefore additional legislation on the subject is superfluous."

V. The plaintiffs are cotton factors, and the defendants cotton brokers or buyers, doing business in the city of Memphis; and at the time of the transaction in controversy in this suit were members of the cotton exchange, while the above provisions of the constitution and by-laws were in force.

VI. The plaintiffs and defendants bargained with each other for the sale and purchase of 270 bales of cotton, selected by sample, and identified by certain marks upon the bales and samples. The cotton was at the time, with other cotton of the plaintiffs', stored in a public warehouse in Memphis. The date of this bargaining was on the seventeenth and eighteenth of October, 1882.

VII. The plaintiffs, as soon as the bargain was made, sent to the warehouseman, according to the usual course of business, written orders for its delivery to the defendants, specifying the lots and marks corresponding to those upon the samples, of which orders the following is a specimen: "MEMPHIS, TENN., Oct. 17, 1882. Merchants' Cotton Compress & Storage Co. will please deliver to A. A. Paton & Co. nineteen bales of cotton, of the following marks and numbers. DILLARD & COFFIN."

VIII. Upon the receipt of these orders the warehousemen turned out the lots of cotton specified, and aligned them in the yard of the shed for convenience of examination, weighing, and marking. On Saturday, October 21, 1882, the agents of the defendants appeared at the shed, and the weigher of the warehouse, jointly with the weigher of the defendants, weighed this cotton, each taking down the weights and agreeing as to the weight of each bale; whereupon the borers of the defendants examined each bale by boring with the auger, and the "classer" of defendants sampled and classed it, two of the bales being rejected and discarded from the lot. These agents of the defendants then marked the cotton with the "class" and "shipping" marks of the defendants, and, according to the usual course of business, placed upon a hook, kept for the purpose outside the warehouse office, a written direction to defendants' drayman to remove the cotton to the place designated therein. It was the habit of defendants' drayman to come to the shed whenever, in the

course of the business, he could, and to take this order from the hook and remove the cotton. The plaintiffs and the warehousemen had done everything required of either in the usual course of business to place the cotton in possession of the defendants, and nothing remained to be done by either to complete the transaction, so far as the right of removal of the cotton by the defendants was involved. About noon this part of the business was completed, and the defendants' agents left the shed, taking with them, as usual, the borings or loose cotton. They reported their weights, etc., to the defendants' office, but at what precise time does not appear by the proof, though it does appear that, in the usual course of business, this was done the same day, or that night, or next morning.

IX. The warehouseman, according to his custom, promptly reported his weights and the rejections to the plaintiff's office, and thereupon, during the afternoon of Saturday, October 21, 1882, they sent their bill or account of the cotton to defendants for $14,945.56, the price agreed upon for the 268 bales, which was not paid. The messenger was instructed to deliver the bill and bring back the check, if paid, but not to insist on payment. The bill was handed to some one in defendants' office, and left there by the messenger. It was the usual custom of defendants to pay for cotton purchased by them at about 2 o'clock P. M., on the day following the examination and weighing, after comparison of the factor's bill as rendered with their own report of the weights and rejections. It was also their custom to have cotton hauled to the compress, and, on receipt of the dray tickets showing its delivery there, to take the tickets to their transportation agent, receive bills of lading, attach them to drafts on their correspondents at Liverpool, or elsewhere, negotiate them in their bank at Memphis, and pay factors by checks on that bank. It was also their custom to remove cotton promptly after examination and weighing, but pressure of business, bad weather, and like circumstances, sometimes delayed removals, so that there was no fixed business custom in that matter, except to remove as speedily as possible in all cases.

X. The defendants were and are entirely solvent, and paid promptly for their purchases, never asking indulgence of plaintiffs.

XI. The plaintiffs never insisted that defendants should pay for their purchases of cotton before its removal from the warehouse or before they took possession, and it was their custom to present their bills to defendants as soon as they received reports of weights, and sometimes, when their bank account was not easy, to ask payment on account before the bills were made out, but not to press for payment on the same day of receiving reports of acceptance by defendants.

XII. The defendants, in a very large proportion of their dealings with the plaintiffs, which dealings covered many years prior and subsequent to the organization of the Cotton Exchange, removed the cotton purchased before paying for it. In the same season of this transaction there were given in evidence 17 other transactions between them of like character, and in 13 of them the cotton was removed before payment; in one instance how this fact was does not appear, and in two of them the cotton was removed and paid for the same day, but which preceded the other, does not appear; and in the remaining transaction the largest part of the lot was removed and paid for the same day, but whether removal or payment first took place does not appear, while a few bales of the lot were paid for before removal. Or, to state these facts somewhat differently, there were covered by these 17 transactions 2,294 bales of cotton, of which 1,720 were removed by the defendants before payment, 531 were removed and paid for on the same day, but whether payment or removal came first does not appear; as to 30 bales no showing whatever is made by the proof, and 13 bales were paid for before removal.

XIII. About 7 o'clock Saturday evening, October 21, 1882, the cotton in the warehouse caught fire, including the 268 bales involved in this contro-

versy and was almost entirely consumed, one bale only of this lot being saved without damage. There were besides this lot of 268 bales in dispute between the parties, 618 bales belonging to the plaintiffs burned in the fire, this disputed lot being in the yard of the shed in the same place it was left at the time of the weighing, examination, and marking above mentioned.

XIV. One of the defendants was at the fire for a short time and knew that their agents had weighed and examined this cotton on that day at this shed, but supposed it was in the compress building, which was separated from the shed by a wall between the two; and on the following morning plaintiffs sent a message to defendants' manager that the cotton could be partiallly saved, and invoked the assistance of defendants to that end, but he declined to have anything to do with it, and denied the defendants had any interest in the cotton. The plaintiffs did all that could be done towards saving this 268 bales with theirs, and, it having become indistinguishable from the other cotton by the destruction of the marks, the whole was sold in a mass as damaged cotton, and plaintiffs did then and now offer to give defendants credit for their share of the proceeds, amounting to $1,110.74, about which estimate there is no dispute; nor is there any dispute about the weights and price of the entire lot of 139,388 pounds for $14,945.56.

XV. The plaintiffs have frequently demanded payment of the defendants, which has been refused.

### CONCLUSIONS OF LAW.

The court found the following conclusions of law, arising upon the foregoing facts:

1. The delivery of the cotton was complete and sufficient to pass the title to defendants before the fire, and the risk of loss was theirs.

2. The plaintiffs are entitled to judgment against the defendants for the sum of $13,834.82, and interest thereon at 6 per cent. per annum from the twenty-first day of October, 1882, to this date, and the amount of the judgment should therefore be $14,996.95, and costs.

*Wright, Folkes & Wright* and *Metcalf & Walker*, for plaintiffs.
*Gantt & Patterson* and *Dyer, Lee & Ellis*, for defendants.

HAMMOND, J. Outside of the rules of the cotton exchange there could be no possible doubt about this case. The delivery was as complete as it was possible to be, and under the general law the title passed to the defendants from the moment they examined, approved, and marked the cotton, and the risk of loss by fire was theirs. *Leonard* v. *Davis*, 1 Black, 476, 483; *Hatch* v. *Oil Co.* 100 U. S. 124, 128; *Tome* v. *Dubois*, 6 Wall. 548, 554; *Williams* v. *Adams*, 3 Sneed, 358; *Bush* v. *Barfield*, 1 Cold. 93; *Porter* v. *Coward*, Meigs, 25; 1 Amer. Law Rev. 413, and authorities cited. The defendants concede this; but they say that under these cotton-exchange rules the contract of the parties was "not a sale, but a mere executory agreement to sell," by the terms of which contract the sale was not completed by the agreement as to quantity, quality, and price, or by that agreement accompanied by delivery, but only by the actual payment of the price, until which payment the title remained with the plaintiffs, and the risk of loss by fire was theirs. And it is as frankly conceded by these plaintiffs that if this case falls within the rules of the cotton

exchange, and this be the proper and legal construction of the contract, the defendants are not liable.

The first inquiry then is, does this contract come within rule 9 of the exchange? It cannot be denied that parties may contract as they please, no matter how injudiciously, in the light of subsequent events, the contract may appear to have been made, or how absurd it may seem in the relation of the parties to it. Nor can it be denied that merchants may voluntarily associate together, and prescribe for themselves regulations to establish, define, and control the usages or customs that shall prevail in their dealings with each other. These are useful institutions, and the courts recognize their value and enforce their rules whenever parties deal under them, in which case the regulations become, undoubtedly, a part of the contract. *Thorne* v. *Prentiss,* 83 Ill. 99; *Goddard* v. *Merchants' Exchange,* 9 Mo. App. 290. But they have not, any more than other customs and usages, the force and effect of positive statutes nor of the rules of the common law, and the courts do not particularly favor them. *The Reeside,* 2 Sumn. 568; *The Illinois,* 2 Flippin, 422. Parties are not bound to contract under them if they choose to disregard them, and they may, and often do, observe part and discard part, as the plaintiffs and defendants here have evidently done. In all the dealings between these parties during that season, exclusive of this, amounting to more than 2,000 bales, only 13 were actually paid for before they were in fact delivered to defendants and by them removed, so far as we can certainly see how that fact was, while more that 1,700 bales were permitted by the plaintiffs to pass into the hands of defendants without payment. And yet, we are asked, as to these 268 bales, to reverse, on the strength of this rule, such a course of dealing, and adhere to its literalism in order to throw this loss on the plaintiffs. Take the rule for all it is worth and it amounts only to this: The plaintiffs and defendants have voluntarily agreed to be bound by it, and, by the same volition, have in all their dealings hitherto paid no attention to it. They have thus established, for themselves and as between each other, a different and special custom to which this rule has had no application, and in direct contravention of it; and this they can always do. *Thorne* v. *Prentiss, supra.* Nor is it necessary to expressly stipulate for such exclusion of the operation of the rules, usage, or custom.

"And not only," says Mr. Parsons, "is a custom inadmissible which the parties have expressly excluded, but it is equally so if the parties have excluded it by a necessary implication, as by providing that the thing shall be done in a different way. For a custom can no more be set up against the clear intention of the parties than against their express agreement." 2 Pars. Cont. 59; Id. (6th Ed.) 546, which was approved in *Ins. Cos.* v. *Wright,* 1 Wall. 456, 471. The supreme court says the usage or custom, when the contract is made with reference to it, becomes a part of the contract, and may not improperly

be considered the law of the contract. *Renner* v. *Bank of Columbia*, 9 Wheat. 581, 588. And the actual custom or usage of the parties in dealing with each other is as much a part of the contract under this rule as a general custom prevailing in the trade. *Bliven* v. *New England Screw Co*. 23 How. 420, 431. "A general usage may be proved in proper cases to remove ambiguities and uncertainties in a contract, or to annex incidents, but it cannot destroy, contradict, or modify what is otherwise manifest. Where the intent and meaning of the parties are clear, evidence of a usage to the contrary is irrelevant and unavailing." *Nat. Bank* v. *Burkhardt*, 100 U. S. 686, 692. Here the intention of the parties to deal with each other, without reference to this custom or rule established for them by the cotton exchange, is manifested in the clearest way by their habitual and uniform dealings with each other for a long series of years prior and subsequent to the organization of the exchange. Neither party has thought it necessary to be governed by it, and like many other rules, usages, and customs it has become, by their voluntary disregard of it, a dead letter. And the explanation of this is found in the fact that the plaintiffs, for whose protection it was evidently intended, did not deem it necessary to enforce it against the defendants, who are so amply solvent that it is their boast in the proof that they never asked indulgence.

If it be conceded that the defendants had an interest in this rule, by reason of the provisions in reference to insurance, the principle is not changed. It would be, then, a stipulation collateral to the contract of sale, and wholly so. Whether the plaintiffs or defendants should, under this rule, have insured the cotton is immaterial and unimportant to the issues in this case. Its insurance or non-insurance by either could not affect the title, or change the risk of loss by fire which always follows the title in the absence of any agreement to the contrary. Either or both might have insured their respective interests in the cotton; and whether one or the other did insure, or omitted to insure, would only tend to show, if they did not intend to assume their own risk, that in their opinion they had an interest, or did not have an interest, as the case might be. But such an opinion by either would not bind the other as to which of them the cotton belonged, in a controversy about the title, as this is. The title must depend on the facts about the contract of sale, and wholly on them. Nor, if we treat it as a question of evidence, does the existence of any supposed interest of the defendants in rule 9 change the result. It is perfectly plain to my mind, in view of the history of this rule in its relation to the underwriters, as shown by the proof, that this last clause was added by the underwriters to make more clear the requirement that the factor's policy should terminate with payment for the cotton; and it may be a proper construction of the rule, as between a factor and his underwriters, if it be true that the policy be written

by this rule, that his policy shall cover his interest in the cotton until it is paid for, no matter how long payment may be delayed, or where the cotton may be, whether in the shed or at Liverpool, or *en route* to that or some other destination. But what interest does this give the buyer in that question, or how can it affect his obligation to pay? Not in the least, it seems to me. Suppose the factor has no insurance,—and he need have none,—of what concern is that to the buyer, and how can it affect his obligation to pay, after he has taken the cotton into his possession and, it may be, consumed it in the mills? Insured or uninsured, as the factor may be, the contract of sale between him and the buyer is independent of the fact, and must stand upon its own bottom, and be determined on its own facts. This rule is clearly not a stipulation by the factor to keep the cotton insured for the *buyer's* benefit; but if it were, the remedy would be a suit by the buyer against the factor for a breach of that stipulation, if it had not been complied with, and not to withhold the purchase money on the theory that there had been no sale. He might set off his claim for damages in a suit for the price, but this case presents no feature of that kind. The provision in this rule about insurance, then, if not one wholly relating to the factor and his underwriter, with whom the buyer has no concern, as it manifestly is, can only be a collateral contract between the factor and the buyer, and in no sense does it afford any solution to the question we have in hand. All evidence whether either plaintiffs or defendants were insured as to this cotton was therefore properly excluded as irrelevant and immaterial.

Looking, then, as we must, beyond and outside of all questions of insurance or supposed insurance, and we are brought back to the fact that, in all their dealings with each other, notwithstanding the pledge contained in article 8 of the constitution of the cotton exchange, the plaintiffs and defendants have, in violation of their constitutional pledges, dealt with each other without regard to the stipulation of rule 9, that "delivery shall not be considered final until paid for;" that is, until the cotton is paid for. The plaintiffs have never refused delivery or retained the cotton until paid for, but have almost always delivered before payment, while the defendants have never been careful to pay before taking possession of and removing the cotton, nor at all scrupulous in regard to it. Perhaps, in the usual order of business, they would prefer to get the cotton, put it under bills of lading, assign them *and the cotton* to their bank in negotiation of bills of exchange with which to supply the funds, and thereby make each shipment or purchase of cotton pay for itself. This is not according to rule 9, for when they have put their bills in bank they have not only had "delivery," but have likewise "delivered" the cotton to another. There is nothing very sacred about the constitutional pledge or rule 9 when the parties mutually agree to the violation, and they need not do this by *express* agreement, as I have already shown. On this subject the supreme court of Illinois says:

"We do not entertain a doubt but that all contracts of sales within the contemplation of these rules must be construed as if the rules were expressly made a part of the contract; but there is nothing to which our attention has been directed, in the charter of the board of trade, and certainly nothing in the general law which prohibits members of that board from contracting 'on 'change,' or elsewhere, so as to bind themselves to obligations beyond and independently of these rules. The only difficulty that can arise in this respect must be in determining whether the parties intended their contract should be construed with reference to the rules of the board of trade, or that obligations were assumed outside of those rules." *Thorne* v. *Prentiss*, 83 Ill. 99, 100.

We may add that the presumption of the law is that merchants deal with each other under the wise provisions and protection of the general law that governs all men in their dealings, unless the contrary clearly appears; and if they expect the courts to observe their rules and enforce them they must themselves observe them. Otherwise, they are neither a custom or usage to control the contract.

This view of the case disposes of it, and, strictly, we need take no further notice of rule 9, but might leave it until its perplexities appear in some dispute between a factor and an insolvent buyer or his attaching creditors, or between a dishonest factor and conflicting buyers, or between some factor and his insurance company,—all of which situations have been suggested in aid of its interpretation. But the learned argument of the defendants' counsel in favor of their contention that this was an executory agreement to sell, and not a sale, under rule 9, should receive from the court that attention it deserves, particularly since this may not be a final disposition of the case, and another court may, possibly, think it necessary to construe this rule as a part of the contract. But I must be permitted to say that the real contention of the defendants is that their risk on cotton purchased by them does not attach until they actually remove it from the warehouse; but there being no such rule among these regulations, they have seized on this contrivance of an executory agreement to sell in order to effectuate the same result. Yet it needs only a little analysis to show that this construction of rule 9 goes further than this and leads to some very absurd consequences, so far, at least, as it concerns the factor—so very absurd that the wonder is sane men should ever have adopted a rule to be so construed.

If the title does not pass to place the risk of loss by fire on the buyer until the buyer pays for the cotton, why draw the line at the cotton-shed? When it reaches the compress, if not yet paid for, the risk of loss by fire is still with the factor. So it is, if not paid for, on the rail or river, at a sea-port, on the ocean, in Liverpool, at the mills, in the store where the cotton goods are on display, and when they have been sold to consumers. Until paid for there is no sale of the cotton, say defendants, and by withholding payment we need not insure at all, but leave the risk with the factor or his insurance company under his

ninth-rule policy; and if burned at sea or elsewhere, not having paid him, he cannot make us pay, and must lose the cotton.

Again, why draw any line at a loss by fire, or at any loss at all? The defense is just as effective were the cotton still in existence. Paton & Co. say to Dillard & Coffin, when sued for the price of the cotton, as they are here sued: "We have not yet paid you, and until it suits our pleasure to pay no title passes, and there has been no sale—only an executory agreement to sell; wherefore, your suit must fail and be dismissed." The result is they keep the cotton and never pay for it, for this is as good an answer to every suit for the price until payment has been made *in fact*, (when there is no longer any need of a suit at all,) as it is here. This is little short of the case put as an illustration by Mr. Justice GRIER, where a man sued by his tailor for the price of a suit of clothes comes into court with the clothes on his back and sets up that the goods were smuggled by the tailor. *Randon v. Toby*, 11 How. 480, 521. Indeed, the defense is not so good, for here there is no fault of the plaintiffs alleged,—absolutely none,—but only that the defendants themselves have not paid what they had agreed to pay. Is it not apparent that the accident of a loss by fire does not change the merits of the defense? It is equally available with or without the loss, for it in no way depends on that accidental circumstance. It is as good with the cotton in Liverpool as it is with its ashes in the Memphis cotton-shed, and no better or worse in either place. Simply stated, the broad proposition is, "This was a conditional sale, or an executory agreement to sell when I pay for the cotton; and, although I have appropriated it to my own use, so long as I do not pay there is no obligation on me to pay, and no suit for the price will lie."

"Was such a thing ever heard of," asks THOMPSON, J., in the Missouri court of appeals, "as that a creditor loses his remedy against his debtor by not demanding payment on the day when the debt fell due?" (*Beveridge v. Richmond*, 16 Chi. Leg. N. 93;) and we may, paraphrasing the question, ask, "Was ever it heard that a buyer can refuse payment for the sole reason that he has not paid?" It must be confessed this may be a possible inference from the literalism of the rule, but it does not certainly appear that it was ever intended to have such a construction as that by the men who made it; nor does the case of *Leigh v. M. & O. R. Co.* 58 Ala. 165, justify such a construction of it. Nor does the case clearly fall within the third rule of Mr. Justice BLACKBURN, so much relied upon by the defendants. 1 Benj. Sales, (4th Amer. Ed.) p. 359, § 366; Id. p. 376, §§ 391–393; Id. p. 396, §§ 425–436. And for the reason that these authorities all show that where delivery has been actually made to the buyer, the intention to reserve the title to the seller and consequent risk of loss by accident, must plainly appear from the terms of the contract. Now, this rule does not say, in terms, that the title is reserved to the seller, but, on the contrary, says that "weighing and

examining the cotton shall be a confirmation of the sale," (whatever that may mean,) but that "*delivery* shall not be considered final until paid for." The construction contended for by defendants is merely inference from this language, and it is susceptible of different and antagonistic constructions. The implications of the parties' dealings and surroundings are not favorable to this construction, and the nature of the trade and property is against it. It is not to be presumed that the seller assumes such peril in the cotton trade without an express or clearly-implied intention to do so. Occasional and exceptional circumstances might prompt a merchant to make such a contract to secure his price, but he would hardly desire it as a business usage in the cotton trade.

The more reasonable construction is that it was intended as a security of a different character, for the sole benefit of the factor against insolvent buyers, and to enable him, in a case where his interest requires, to keep the cotton in his possession, and refuse to surrender that possession until payment is made. It may be the courts would, possibly, in favor of the factor, extend the construction to cover a case where the purchaser was in actual possession and refused to pay, by holding that it was a conditional sale, and that the title remained, as between these two, with the factor until payment actually made,—or as between the factor and creditors of the purchaser,—but it is hardly possible the courts would, in favor of the buyer after he had taken absolute dominion, construe the rule to be only an executory agreement to sell when payment was made. If so, as to either construction, without a stipulation to the contrary, the risk of loss by fire would, undoubtedly, remain with the factor. These are, however, perplexities about this construction, as between the factor and those claiming against him, it is best to leave for decision when the cases arise. But as between the factor and the buyer, no matter what the proper construction of the rule may be, the factor may always waive this security in his favor, deliver the cotton unconditionally, and collect his money. Whenever he delivers the cotton absolutely, without any manifestation of an intention to claim his security, or, rather, with an expressed or plainly implied relinquishment of it,—whatever be its legal characteristics,—from that moment the title passes to the buyer, the risk of loss by fire is his, and he can never defend a suit for the price by refusing to perform the condition or carry out his part of the executory agreement. As to him the contract becomes executed whenever the seller chooses to so deliver and he accepts. The seller may, under such a contract, always waive the stipulation in his favor, and he does this whenever he delivers with the intention of not claiming it. That the plaintiffs did this here is abundantly shown by the proof. The waiver need not be express, but may be by implication resulting from acts and conduct. 2 Benj. Sales, p. 742, § 858. Of course, I need not say that plaintiffs here would not be permitted to exercise their right of waiver

after a loss by fire, so as to change the risk. They did not do this, but waived their security under this rule by delivery prior to the fire, without insisting on payment under the rule before delivery, as they had often done before. Neither will the defendants, after accepting this waiver by taking the cotton, be permitted to change the risk by refusing a payment which they were under legal obligation to have made on Saturday, before the fire. I do not think either the plaintiffs or defendants had any intention of making the kind of contract the defendants now pretend to have made, by distorting the language of this rule; but if they ever did intend to trade under the rule, they never carried out that intention, so far as this proof shows, and this is a waiver of it. The proposed usage of rule 9 has never become a usage at all as to these two members, and this by their own act.

Judgment for the plaintiffs.