GENTRY vs SINGLETON.

Opinion delivered September 25, 1902.

1. *Trial—Error not Prejudicial no Ground for Reversal.*

In an action for conversion of certain cattle, the court erroneously ruled that the burden of proof was on the defendant to show that plaintiff was not entitled to the number claimed; but in view of

admissions in defendant's answer and evidence conclusively show-
ing the number, the error was of no injury to defendant and, there-
fore, no ground for reversal.

2. *Evidence—As to Partnership, Immaterial in Absence of Objection to De-
fective Parties.*

In an action for conversion, evidence as to a third person's relation
to plaintiff, whether as agent or partner, *Held,* to be immaterial
where defendants made no objection to plaintiff's capacity to sue.

3. *Conversion—Agency—Evidence—Sufficiency as to Directing Verdict.*

In an action for conversion of cattle, the evidence showed that de-
fendant bought the cattle from a man then in charge of the same
but who was not employed by plaintiff to assist in the purchase or
sale of said cattle, but was employed by a joint owner with plaintiff
to assist in helping drive the cattle to Kansas for which he was to
receive a portion of this joint owner's share of the profits, and this
was known to plaintiff; that as soon as the sale by this third
party was discovered plaintiff informed the purchaser of the state
of the case, and plaintiff's joint owner, who was absent when the
sale was made, at once telegraphed plaintiff in regard thereto; that
when cattle were first purchased by plaintiff's joint owner, who
paid for same, this third party was present but was introduced
to the then owner by plaintiff's joint owner as a man who was
helping him with the cattle. *Held,* sufficient to justify a directed
verdict for plaintiff, defendant's claim of agency of the seller not
being borne out by the evidence.

On rehearing.  Affirmed.

For former opinion, see 3 Ind. Ter. Rep. 316 (61 S .W. 930)·

The plaintiff below (appellee here) commenced this suit
on the 21st day of August, 1897, by filing his complaint at law
in the United States Court at Muskogee, and alleged that on the
1st day of July, 1897, plaintiff was the owner of 56 head of steer
cattle, from three to five years of age, which were branded as
taken in book W. C. & B., and other bought brand; that said

cattle were of the value of $1,800; that subsequently, and on the —————— day of July, 1897, "defendant obtained possession of said 56 head of steer cattle and has since said date sold and disposed of the same, and has converted the proceeds thereof to his own use; that plaintiff has demanded of defendant the restoration of said cattle to him, or the payment by defendant to plaintiff of their value, but that defendant has wholly failed and refused, and still fails and refuses, to restore said cattle to plaintiff, or to pay to him the value thereof; that plaintiff has been damaged by defendant's taking and conversion of said cattle in the sum of eighteen hundred dollars ($1,800);" and plaintiff prays that he have judgment against defendant for $1,800, with interest at 6 per cent. per annum from the date of filing complaint. On the 8th day of September, 1898, defendant filed answer, and denies the allegations of plaintiff's complaint, and alleges that on or about the 26th day of July, 1897, he became the true and lawful owner of —————— head of cattle; that he acquired possession and title to said cattle from one J. N. Henry, to whom he paid their full value; that said Henry was at the time rightfully in possession of the said cattle, and had full· power to dispose of the same by sale or otherwise; that he attaches the checks by which he paid Henry the full value of the cattle, "and that, if the plaintiff herein was at any time and in any way interested in the said cattle, the sale by Henry of the said cattle to the defendant was and is binding upon the plaintiff; and that, if the said acts of Henry in disposing of the said cattle ware not binding upon the plaintiff, by his acts and conduct subsequent to the sale of the said cattle to the defendant by Henry the plaintiff has estopped himself from asking or claiming relief from the defendant." Defendant prays to be adjudged the owner of said cattle and that he recovers his costs.

On October 3, 1898, both parties announcing "Ready for trial," a jury was impaneled and sworn, and plaintiff testified

in his own behalf, and introduced one J. A. Skaggs as a witness on behalf of the plaintiff; and after the direct examination, and during a long cross-examination, the following, among other proceedings were had:

"Q. Mr. Skaggs, you say that Mr. Singleton furnished you with the money to buy and sell cattle? A. Yes, sir. Q. You were dealing in stock in Oklahoma and the Indian Territory? A. I was buying those cattle for him and I— Q. Were you not also selling them? A. No, sir. Q. What was the agreement between you and Mr. Singleton as to the profits? A. I was to have one-half made out of the cattle above cost. Q. You took in Mr. J. N. Henry with you to buy and sell cattle? A. No, sir. The Court: If he states that he had authority, he might state if he had authority from Mr. Singleton to sell these cattle. (To which ruling of the court defendant, by his counsel, then and there excepted.) Witness: Singleton never authorized me to sell these cattle, if I had sold them. Mr. Martin: Q. You had general power to buy and sell cattle? A. We were buying those cattle to take to Kansas. Q. Will you explain the connection that you had with Mr. Henry? Mr. West: We object to that. The Court: You may state whether you were authorized to sell these cattle to anybody else. A. I never sold them to anybody else. Q. Did you sell them to Henry? A. No, sir. Mr. Martin: Q. Mr. Skaggs, did you employ or enter into a contract or agreement with Mr. J. N. Henry to assist you in the purchase or in the purchase and sale of cattle? (Objected to by plaintiff. Witness answers, 'No, sir.') Mr. Martin to the witness: Did you employ Mr. Henry as an agent to assist you in the purchase and sale of cattle, or these cattle? (Plaintiff objects to question for the same reason as urged to the other questions on this line. Objection sustained by the court. To which ruling and action of the court the defendant duly excepted, and still excepts.) Mr. Martin: Q. Will you please explain how Mr. Henry happened

to be with you, and in what way did he figure in this transaction of the purchase of the cattle from Charles Bruner? Mr. West: Question objected to. (Objection sustained by the court, defendant excepting; the court remarking that "it is not competent to show that Henry did work for this man, nor for the other man, for the purpose of showing title in Henry.') Mr. Maxey: We are not trying to show title in Henry, but we contend that Singleton, and not Gentry, should suffer. If a man can give others money, and send them out over the country to buy cattle and sell cattle, and clothe them with apparent ownership, so as to deceive people, it will work innumerable hardships. The Court: The only allegation here is this: 'And that if the plaintiff herein was at any time or in any way interested in the said cattle, the sale by Henry of the said cattle to the defendant was and is binding upon the plaintiff, and that, if the said acts of Henry in disposing of the said cattle were not binding upon the plaintiff by his acts and conduct subsequent to the sale of the said cattle to the defendant by Henry, the plaintiff has estopped himself from asking or claiming relief from the defendant.' I don't think the averment there is one upon which you can set up any evidence which does not show that the plaintiff was responsible for the acts of Henry,—that Henry was the agent of the plaintiff. Mr. Martin: We think that we can show that if you will let him answer the questions. The Court: To introduce testimony, you must establish an agency. You are establishing what acts he did, but the plaintiff cannot be bound by anything Henry did unless he was acting as his agent. (To which ruling of the court, defendant, by his counsel, then and there excepted.) Mr. Martin: This is the position we take: We think the evidence so far will show that Mr. Singleton and Mr. Skaggs were partners in the cattle business for the purpose of buying and selling cattle. We want to show that one partner can employ agents and servants, etc., to carry on the business. We think that the evidence up to this point shows that Singleton and Skaggs were in the cattle

business generally. The Court: The testimony shows that the plaintiff made a contract with this witness; that the witness was to buy cattle for the plaintiff, and he was to enjoy the profits in the cattle. There is nothing in the testimony up to this point to show that Henry was an agent of either of them, or had authority from either one. If it was for the purpose of proving that this man authorized him to sell these cattle for Singleton, it would be competent. (To the witness:) You may answer whether you made any contract with Mr. Henry by which you authorized him, as agent for either you or Singleton, to sell these cattle? A. No, sir; I did not. The Court: The court has stated that Henry is a stranger to this suit. (To which ruling and remarks of the court the defendant, by his counsel, then and there excepted. Mr. Martin (to the witness): Q. Did you enter into an agreement with Mr. Henry whereby he was to assist you in the purchase and sale of cattle? A. No, sir. Q. Purchase and sale of them. A. No, sir. Q. Will you please state what your agreement with Mr. Henry was? A. My agreement with Henry was this: He furnished me a man to help me to Kansas with these cattle, and I was to give him one-fourth of what I made out of it after the cattle were sold. Q. Did you not return to Shawnee after the purchase of these cattle, and leave Mr. Henry in charge of them? A. No, sir. Mr. Martin: Now, I think it would be proper to explain what connection Mr. Henry had with this transaction. The Court: It is all incompetent, because he has stated what his arrangement was. It did not make him an agent, and it is irrelevant to show that he had some outside talk with him. It is incompetent and does not prove anything. He has stated what arrangement he had. He states that he did not authorize him to sell, and that he did not leave him in possession of them. Your testimony has utterly failed to show an agency. Before you can introduce any testimony which relates to the acts of Henry, you must first show that he at least was authorized to speak for somebody that sued in this case.

(To which ruling and remarks of the court the defendant then and there excepted.) The Court: The defendant asks the court to adjourn until to-morrow morning, for the purpose of enabling him to submit to the court at that time an amended answer, which motion is allowed, and the court, accordingly adjourns until to-morrow morning at nine o'clock.

"October 4, 1898, 9.30 a. m. Mr. Maxey: The defendant asks leave to file his amended answer. (Amended answer filed.) The Court to plaintiff's attorneys: Have you any objection to the filing of this answer? Mr. West: The third paragraph of their answer is open to demurrer and should be stricken out; also the fifth, sixth, and seventh. Comes the plaintiff, Thomas C. Singleton, and demurs to the third paragraph of the defendant's answer filed herein, because the same does not state facts sufficient to constitute a defense to this action; and the fifth, sixth, and seventh paragraphs upon the same grounds. (Demurrer argued.) Mr. West: I think it would be better to file a motion to make the seventh paragraph more definite and specific. We change our demurrer to make the seventh paragraph more definite and certain, and still demur to the third, fifth and sixth paragraphs. The Court: The demurrer to the third, fifth, and sixth paragraphs of the defendants amended answer is sustained, and the motion to make the seventh paragraph of the answer more specific and certain is allowed. Mr. Maxey: We will comply with the motion, and take leave to amend. The Court: Leave to defendant to amend their answer. Court here arises until 2 o'clock p. m.

" 2:30 p. m. Amended answer filed. Trial proceeds with Mr. Skaggs being recalled by the plaintiff."

It thus appears after the trial had been proceeding for a day, that on October 4, 1898, defendant filed an amended answer and that to the third, fifth and sixth paragraphs of the same a

demurrer was interposed, and sustained by the court, and to the seventh paragraph of the same a motion was made to make the same more definite and certain, which was allowed, and defendant took leave to amend, and the court rose until 2 o'clock p. m. and at 2:30 p. m. defendant filed a second amended answer, and the trial proceeding by plaintiff recalling witness Skaggs, and defendant's counsel proceeded with the cross-examination of said witness. It does not appear from the record that any motions or demurrer were filed by the plaintiff to this last answer. Said second amended answer admits citizenship as alleged by plaintiff. Denies that plaintiff on the 1st day of July, 1897, was the owner of the 56 head of cattle described in his complaint, "but alleges the fact to be that, if plaintiff had any interest on said date in said cattle, that it was but a joint interest or copartnership interest with one J. A. Skaggs or with one J. A. Skaggs and one J. N. Henry, the exact nature of said copartnership being to the defendant unknown." Denies said cattle were of the value of $1,800, but alleges they were worth more than $1,500. "(4) Defendant, further answering, says that he is not sufficiently informed to have a belief as to whether the cattle described in plaintiff's complaint ever came into his possession or not, and asks that plaintiff be required to make strict proof of said allegation, but defendant avers that, if said cattle did come into his possession, that he bought them and paid their full value in the usual course of business from J. A. Skaggs and J. N. Henry, or one of said parties, who were the copartners or agents of the plaintiff, and clothed with full power to sell the same, and that defendant had no knowledge of any claim that plaintiff may have had to said cattle, as partner or otherwise, at the time he purchased the same, but that said parties from whom he purchased sold him said cattle together with other cattle, and represented to the defendant that they were the owners of and entitled to sell said cattle, and defendant relying upon said representation, and finding said party or parties from whom he purchased said

(24)

cattle in the possession of the same, and clo d with the apparent ownership and right to sell, and relying upon the representation made to him he in good faith purchased said cattle from said parties or party, and paid them the reasonable value for same." Denies that plaintiff ever made demand upon him for restoration of said cattle, or their value, and that plaintiff has been damaged in the sum of $1,800, or any other sum. Defendant further says that about the 17th day of July, 1897, he bought a number of cattle from J. N. Henry, or Skaggs and Henry, and that he has since been informed that the cattle plaintiff claims were among the cattle which he bought from Skaggs and Henry, or one of them, but defendant avers, that Skaggs and Henry had two or three different bunches of cattle at different places, and defendant bought all of them, "among them a bunch of about fifty (50) head, which defendant was informed that said Skaggs and Henry had bought a few days prior thereto from one Charles Bruner, and defendant is now advised that the bunch of cattle which Skaggs and Henry bought from said Bruner are the cattle which plaintiff now claims." Defendant says he purchased said cattle plaintiff claims in the usual course of business, and whether a portion were delivered by Skaggs, and a portion by Henry, he does not now recall. They were operating together, and reputed to be partners, in the buying and selling of cattle in that neighborhood. Defendant further says that the cattle sued for were purchased by Skaggs and Henry from Charles Bruner, and were left in Bruner's pasture, and agreeing to pay Bruner pasturage and one or the other would call and take them away at some future day; that thereafter J. N. Henry did go with William McGill, the agent and employee of the defendant, to said pasture, and turned said cattle over to said McGill for the defendant, and said Henry paid Bruner the pasturage; that Skaggs and Henry represented to defendant that they were the owners of said cattle and had a right to sell the same, and, believing said Skaggs and Henry were the owners and had the right to sell said cattle, he pur-

chased the same and paid the reasonable market value therefor. Defendant further says he is advised that plaintiff and Skaggs in the spring of 1897 entered into a copartnership for buying and selling cattle, plaintiff to furnish the funds, and Skaggs to furnish his time and skill, that Skaggs was the active and business manager; that Skaggs afterwards entered into an agreement with J. N. Henry that Henry should assist Skaggs in buying and selling cattle; that plaintiff knew of said arrangement between Skaggs and Henry, or could have known of it if he had paid due attention to his business, and that plaintiff and Skaggs knew all about the sale by Henry to defendant of said cattle on July 17, 1897, or were informed of that fact in a short time, and before defendant removed said cattle to the railroad and shipped them, and that plaintiff and said Skaggs withheld from defendant the knowledge that Henry had no right to sell said cattle, or that they claimed said cattle, until atfer defendant had fully paid Henry for the same, and Henry had sold out all his property and left the country, and alleges that plaintiff and Skaggs were in conference with said Henry for several days after it is claimed he sold said cattle to the defendant, and it was not until said Henry had refused to account to plaintiff and Skaggs, and they had scared him out of the country with threatened prosecution, or otherwise induced him to leave the country, that they ever claimed to defendant that the cattle in question belonged to plaintiff, and said Henry had no right to sall the same. "Defendant therefore says that the plaintiff is now estopped from maintaining this action against the defendant for the value of said cattle," and that he recover his costs.

The filing of the foregoing answer was permitted, and the subsequent proceedings had in the case shown by the record as follows:

"Thereafterwards, on October 4, 1898, the following further proceedings were had in said cause, to wit:

"Thomas C. Singleton vs William E. Gentry. (No. 3325.) 10—4—98. On this day the parties herein appear as on yesterday, and, the defendant having filed their amended answer, the plaintiff demurred to the third, fifth, and sixth paragraphs of said answer, and also moved the court to require defendant to make the seventh paragraph of his answer more definite and certain; and the court, having heard the argument of counsel and being well and sufficiently advised in the premises, doth sustain said demurrer and motion, to which action of the court in sustaining said demurrer and motion the defendant at the time objected and excepted, and asks leave until 2 o'clock p. m. to further amend their answer. At 2 o'clock p. m., the parties herein having appeared, and the jury having come also, the defendant filed his second amended answer, and the trial progressed, and, all of the evidence having been produced, the plaintiff herein at the close of the testimony moved the court to direct the jury to return a verdict for the plaintiff, which motion is granted, and the court directed the jury to return a verdict for the plaintiff herein for the value of the cattle in controversy in this action at the time and place of their conversion by the defendant; and the jury, having retired to consider of their verdict, afterwards returned in open court the following verdict, to wit: 'We, the jury, find in favor of the plaintiff, and assess his damages at $1,550.00. (Signed) E. G. Bell, Foreman.' Whereupon the jury in this case was discharged."

Whereupon the defendant on October 6, 1898, filed his motion for a new trial, ·which was subsequently overruled, and judgment rendered for the plaintiff upon the verdict, to which action of the court defendant excepted and prayed an appeal to this court, which was allowed.

TOWNSEND, J. The appellant has filed 14 specifications of error in this case. They are as follows, to wit: "Specification of errors: (1) The district court erred in holding that the burden

of proving that the appellee was not entitled to fifty-six head of cattle, as mentioned in the appellee's complaint, was upon the appellant. (2) The district court erred in refusing to permit the witness J. A. Skaggs to testify as to the connection that J. N. Henry had with his business in buying and selling cattle. (3) The district court erred in not permitting J. A. Skaggs to testify as to whether or not he employed or entered into a contract or agreement with J. N. Henry to assist him in the purchase and sale of cattle. (4) The district court erred in striking out the question and answer of witness Skaggs as to how he introduced Henry to Charles Bruner, from whom the cattle were purchased —whether as a partner or as an agent. (5) The district court erred in confining appellant to the proof as to whether Skaggs sold the cattle in question to any person by appellee's authority. (6) The district court erred in refusing to allow the witness Skaggs to testify as to whether or not he employed Henry as an agent to assist him in the purchase and sale of cattle generally, or in the purchase and sale of the cattle in question. (7) The district court erred in not permitting witness Skaggs to testify as to the connection Henry had with the transaction and purchase of the cattle in question. (8) The district court erred in holding that, to introduce testimony, appellant had to establish an agency, and in refusing to admit such testimony as constituted an agency on the part of Henry. (9) The district court erred in holding that Henry was a stranger to the suit. (10) The district court erred in holding, as a matter of law, that the testimony of appellant failed to constitute an agency on the part of Henry. (11) The district court erred in refusing to permit appellant to introduce testimony showing that the appellee was guilty of negligence in not notifying him of Henry's inability to sell said cattle until Henry had departed from this country. (12) The district court erred in refusing to permit the witness Bruner, to testify as to who he contracted with in making the sale of the cattle in question. (13) The district court erred in granting a peremptory

instruction on motion of the appellee directing the jury to return a verdict for appellee, and in requiring them to assess his damages at the value of fifty-six head of cattle mentioned in his complaint. (14) The district court erred in overruling appellant's motion for a new trial, to which ruling of the court appellant, by his counsel, then and there excepted." It appears from an examination of the record in this case that the specifications of error numbered from 1 to 11 inclusive, relate wholly to proceedings in the case that transpired before the second amended answer was filed, upon which answer appellant insists the case was tried. The method of amending pleadings that obtained in this case is, in our judgment, without precedent and wholly unauthorized. It appears, that at the April term, 1901, of this court, an opinion was handed down in this case by Judge Thomas, then a member of this court, reversing the judgment of the lower court, but that subsequently a petition for rehearing was filed by order of Judge Gill, and upon proper showing a rehearing was ordered. It is quite evident from the statement of the facts of the case by Judge Thomas in his opinion that by some oversight or mistake the learned judge failed to correctly state the facts as disclosed by a careful examination of the record.

Under the first specification of error the appellant is unquestionably correct in the statement of the law that the appellee should be required to prove the allegations of his complaint, but was the appellant injured in any respect whatever by this ruling? This ruling of the court and exception of the appellant were made prior to the filing of appellant's second amended answer, in the sixth paragraph of which appellant says:

"But defendant avers that, at the time he bought said cattle, that the said Skaggs and Henry had two or three different bunches of cattle at different places in the Seminole country, and that defendant bought all of said different bunches of cattle; among them being a bunch of about 50 head, which defendant

was informed that said Skaggs and Henry had bought a few days prior thereto from one Charles Bruner, and defendant is now advised that the bunch of cattle which Skaggs and Henry bought from said Bruner are the cattle which plaintiff now claims."

It thus appears that appellant admits that he purchased the cattle bought of Charles Bruner,—about 50 head,— and witness Skaggs testified as follows: "Q. Did you buy the cattle described in this complaint at any time during the year 1897? A. Yes, sir. Q. From whom did you purchase them? A. Charlie Bruner. Q. Who furnished the money with which these cattle were paid for? A. Mr. Singleton. Q. How many of these cattle were there? A. There were fifty-six head."

The checks given to Bruner by Skaggs were introduced in evidence, and are as follows:

Exhibit A. "C. J. Benson. Shawnee, O. T., June 29, 1897. No. 50 steers. Shawnee State Bank: Pay to B. Bruner_____ or order $500 (five hundred_____dollars). [Signed.] J. A. Skaggs." Indorsed on face: "Shawnee State Bank. Paid Jun. 30, 1897, Shawnee, Ok. Ty." Indorsed on back: "This part payment on fifty 4 & 3 year stears. [Signed.] Chas. Bruner & A. D. Bruner."

Exhibit B. "Shawnee, O. T., July ,1897_____No· balance on 56 stears. Shawnee State Bank: Pay to C. Bruner _____or bearer $1,052 (ten hundred & fifty-two_____ dollars). [Signed.] J. A. Skaggs." Indorsed on face: "Shawnee State Bank. Paid Jul. 7. 1897. Shawnee, Ok. Ty." Indorsed on back: "[Signed.] Chas. Bruner."

Skaggs further testified as follows: "Q. Where were the cattle at the time they were purchased? A. In Mr. Bruner's pasture. Q. Where is that pasture? A. In the Seminole Nation. Q. Were they then taken out of that pasture by you? A. Taken

out to brand, only. Q. When did you do that? A. It was about the— I could not just give the date. I can guess at it pretty close by one of those checks there. Q. It was about the 7th of July? A. Yes, sir; something near the 7th. I think I gave him this check after I had branded the cattle, as well as I recollect. Either just before or just after that. Q. What was then done with the cattle? A. Put back in Mr. Bruner's pasture. Q. Had you left the cattle out there all the time without looking after them? A. I had seen them, probably, once after I branded them. After I branded them I went over and bought six head more, and put them back in the pasture." Charles Bruner, witness for appellant, also testified as to the number of cattle, as follows: " Q. Were the cattle gone when you got back? A. The cattle did not that time. Mr. Skaggs came back there when he came to brand them. We cut the cattle out, and at that time— At the first time he only bought 50 head. When we cut the cattle there were five or six more of the same kind of cattle —similar cattle. We made a trade as to the price, and he took five or six more." It thus conclusively appears that there were 56 head of cattle, and the court's ruling as to the burden of the proof, admitting it to have been erroneous, could have been of no possible injury to the appellant.

As heretofore stated, specifications of error down to and including No. 11 were as to proceedings that occurred at the trial prior to the filing of the second amended answer. After the filing of the second amended answer it does not appear that counsel for appellee made any objection to the introduction of testimony, and counsel for appellant were allowed to proceed without objection. The errors assigned in not permitting witness Skaggs to testify as to what agreement he had with Henry are not well taken, as the record heretofore copied in the statement of fact fully explains his agreement with Henry, and that was that Henry, should furnish a man to help him with the cattle to

Kansas. The error alleged in striking out the question and answer as to how the witness Skaggs introduced Henry to Bruner —whether as a partner or agent—is not well taken, for the reason that said question and answer were not stricken out by the court, and exhibit a careless and negligent inspection of the record by appellant's counsel. The court expressly says, "The objection would be sustained in each case if the witness had not already answered." Appellant insists that appellee and witness Skaggs were partners, but no objection is taken to appellee's capacity to sue in this action, and we are at a loss to discover how the same becomes material . Whether Skaggs and the appellee were partners in the business of buying and selling cattle, or Skaggs was an agent for appellee, how does it assist appellant in this action, unless he can show that he purchased the cattle from appellee or Skaggs, or from some one authoriezd by one or both of them to sell this particular lot of cattle? There is absolutely no proof in this record that Henry had any interest in this lot of cattle, or had any authority from either appellee or Skaggs to sell the same. The cattle were never in his possession until he stole them from the Bruner pasture, and the circumstance of his being present when Skaggs bought the cattle from Bruner, and Bruner being absent, enabled Henry to get them and sell them to appellant. As soon as Skaggs learned of it he endeavored to find the cattle and when he learned appellant had bought them he immediately notified him that the cattle had been stolen. The only pretense of a defense is that appellant or Skaggs had by some act clothed Henry with the apparent authority to sell these cattle, and the appellant, acting in good faith upon such apparent authority, secured a good title, and that the appellee is estopped from recovering the cattle by reason of his act or the act of Skaggs in thus holding out Henry or clothing him with apparent authority to sell. Having examined the record with much care, all connection that Henry had in any way with this lot of cattle is shown by the evidence of Skaggs

witness for appellee, and Bruner, witness for appellant. The same has been fairly collected by counsel for appellee, and is as follows: "That he did not employ or enter into a contract with J. N. Henry to assist him in the purchase or sale of cattle. That Henry was to furnish him a man to help him to Kansas with these cattle, for which Skaggs was to divide his part of the profits with him. That Henry was with him when he went to buy these cattle at Bruner's. That he did not introduce Henry to Bruner as his partner. That he (Skaggs) did all the buying, and the only use he had for Henry was to help him take care of the cattle. That he didn't know anything about Henry's paying Bruner for the pasturage of the cattle. That he didn't know to whom the cattle were sold till after he saw Gentry at Checotah. That after he found this bunch of cattle he got a warrant for Henry, for fear he would steal other cattle. That he was afraid of Henry, and afraid to try to force a settlement for the missing cattle with him. That Henry commenced helping him with these cattle about May or June. That Henry and himself were not together much. Henry furnished a man who helped him with the cattle. That Singleton knew of the arrangement with Henry just after the first bunch of cattle was brought from Bruner. That Henry told Singleton he claimed no interest in the cattle except when the cattle were sold; then he claimed one-fourth of the profit. That he understood Henry sold some cattle of his own to Gentry's agent at the same time he sold these. That as soon as he heard Gentry, of Checotah, was the man who got the cattle, he got on the train, and went over there and told him the true status of affairs. That Henry was not present when he (Skaggs) took the cattle out of the Bruner pasture and branded them and put them back in the pasture. That the only service Henry was to render was to furnish a man to help with the cattle over to Kansas, where he expected to carry them. That he (Skaggs) was absent when he (Henry) sold these cattle. That as soon as he found out they were gone, he wired Singleton, who came down,

but had to go back on account of sickness before he found out
anything; then heard first the cattle went to Okmulgee, and
wired Singleton to go there; and then went to Checotah, and
wired Singleton to meet him there.   Chas. Bruner testified:
'Don't remember the day they (Skaggs and Henry) came there,
but think it was the latter part of June.   They came over one
morning, driving in a single-seated buggy.   I was just going out
to pasture, to ride fence.   Mr. Skaggs said he heard I had cattle
for sale.   I said, "Yes."   He asked where.   I said, "In the
pasture."   We started up in the pasture.   When we got to the
southwest corner of the pasture, Mr. Skaggs said, "Let me take
your horse, and you get in the buggy."   I said, "All right;"
and he rode my pony, and I went in the buggy with Mr. Henry
over there to the east side of the pasture, where the water tank is.
After we got there, we drove in, watered the team, and drove up
the hill.   We got out of the buggy, and Mr. Skaggs got off the
pony.   We stood talking and making the trade.   I priced the
cattle, and he afterwards agreed to buy them, and said that he
would pay me $500 on the cattle, and let the cattle stay in the
pasture until I saw that the check was all right.   I told him that
I was going away; that I would send the check over by my wife,
and that she would take care of it; that I had to go away.   While
we were talking after we had made the trade, we were standing
in a group.   He introduced Mr. Henry, and said, "This is Mr.
Henry, the man that is helping me with the cattle."   After he
had talked awhile he said he wanted the cattle to stay in the
pasture.   He said he would pay me by the week, I believe.   Any-
way, it amounted to $6.   Can't recollect how that was, but the
cattle were to remain in the pasture.   I told them that I would
not be there; that I had a man riding the pasture, but would not
be responsible unless I was there myself; and he said that he or
Mr. Henry would be around there to look after the cattle."

Mr. Mechem, in his work on Sales (section 154), states the
legal principles, in our judgment, applicable to this case, as fol-

lows: "It is a fundamental doctrine of the common law, from which all discussion of the question must proceed, that, in general no one can transfer a better title to a chattel than he himself possesses. 'Nemo dat quod non habet' is usually the inflexible maxim. That some or all of the parties acted in good faith or parted with value is usually immaterial. However innocent the motives, or however vaulable the consideration, if the party who assumed to convey had no right or title to trasfer, no title can pass to the other. * * *

"Sec. 156. Whether the possessor is the true owner, or a bailee, or the finder, or a thief, the evidence of possession may be precisely the same, and to make possession the test of ownership is obviously impossible. It may be prima facie evidence but it is nothing more. Whoever, therefore, buys from one in possession, must see to it, at his peril, that the seller has some other title than that which possession alone confers upon him. For if the seller were but a bailee of the true owner, his servant or lessee, or if the seller were a mere finder or a thief, the purchaser, however innocent he may have been, or however much he may have paid for the property, can acquire no claim as against the true owner of the goods. Simply intrusting the possession of a chattel to another, as depository, pledgee, or other bailee, or even under a conditional executory contract of sale, is clearly insufficient to preclude the real owner from reclaiming his property in case of an authorized disposition of it by the person so intrusted. The mere possession of chattels, by whatever means acquired, if there be no other evidence of property or authority to sell from the true owner, will not enable the possessor to give a good title.

"Sec, 157. But while possession alone is thus not sufficient evidence of ownership, it is possible that the true owner may have clothed the possessor with such additional evidence of title as to cause the possessor to appear to be the owner. "It

must be conceded,' it is said in a leading case, 'that, as a general rule applicable to property other than negotiable securities, the vendor or pledgor can convey no greater right or title than he has. But this is a truism, predicable of a simple transfer from one party to another, where no other element intervenes. It does not interfere with the well-established principle that where the true owner holds out another or allows him to appear as the owner of, or as having full power of disposition over, the property and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyanec.'

"Sec. 158. In order, however, that this rule shall operate, it is essential that the acts relied upon as indicating ownership by the possessor shall be acts for which the true owner is responsible; for it is clear that no acts of the possessor alone can suffice to cut off the rights of the true owner. The acts relied upon must, however, be such as to reasonably warrant the conclusion that the possessor was authorized to sell. Thus, for example, while it may be true that sending goods to an auction room, or to any other place to which goods are sent only to be sold, sufficiently indicates that the owner desires them sold, still the mere fact, that one puts his goods, for some other purpose than sale, into the posssesion of one who may happen to be a dealer in similar goods, does not of itself justify the conclusion that the dealer is to sell these goods. Independently of the provisions of the statute in regard to the dealings with agents and factors it is very clear, it is said, that the bare possession of goods by one though he may happen to be a dealer in that class of goods

does not clothe him with power to dispose of the goods as though he were the owner, or as having authority as agent to sell or pledge the goods to the preclusion of the right of the real owner. If he sells as owner, there must be some other indicia of property than mere possession. There must be some act or conduct on the part of the real owner whereby the party selling is clothed with the apparent ownership or authority to sell, and which the real owner will not be heard to deny or question to the prejudice of an innocent third party dealing on the faith of such appearances. If it were otherwise, people would not be secure in sending their watches or articles of jewelry to a jeweler's establishment to be repaired, or cloth to a clothing establishment to be made into garments. 'It is not every parting with the possession of chattels or the documentary evidence of title,' it is said in another case, 'that will enable the possessor to make a good title to one who may purchase from him. So far as such a parting with the possession is necessary in the business of life, or authorized by the custom of trade, the owners of the goods will not be affected by a sale by the one having the custody and manual possession. But the owner must go farther, and do some act of a nature to mislead third persons as to the true position of the title.'

"Sec. 159. Again, the purchaser must actually have parted with value in reasonable reliance upon the apparent authority so that he will be prejudiced if the transaction is not upheld. 'Two things must concur,' it is said, 'to create an estoppel by which an owner may be deprived of his property by the act of a third person, without his assent, under the rule now considered: (1) The owner must clothe the person assuming to dispose of the property with the apparent title to or authority to dispose of it; and (2) the person alleging the estoppel must have acted and parted with the value upon the faith of such apparent ownership or authority, so that he will be the loser if the appearances to

which he trusted are not real.  In this respect it does not differ from other estoppels in pais.'"

See Jetton vs Tobey, 62 Ark. 88, 34 S. W. 532, as follows: "A general rule of the law of personal property is that no man can sell that which he has not, and is not authorized by the owner to transfer, or confer a better title than that he has.  An honest purchaser under a defective title cannot hold against a true proprietor.  'No one can transfer to another a better title than he has himself, is a maxim,' says Chancellor Kent, 'alike of the common and civil law, and a sale, ex vi termini, imports nothing more than that the bona fide purchaser succeeds to the rights of the vendor.'"  Page 90, 62 Ark., and p. 533, 34 S. W.: "The mere possession of personal property, without other evidence of title, or authority from the owner to sell, will not enable the possessor to confer a better title than he actually has.  As said by Chief Justice Brickell in Leigh vs Railroad Co., 58 Ala. 178: 'Possession is prima facie evidence of the ownership of all species of personal property.  It is but prima facie, and whoever deals alone on the faith of it must accept it as such, and in subordination to the paramount title, which would prevail over it if the possession was not changed by the transaction into which he enters.  If this be not true, a felon acquiring possession by theft could, by a sale to an innocent purchaser, devest the true owner of his property.  A naked bailee, intrusted with possession, could dispose of goods to the prejudice of his principal.  A case does not fall within the exception unless the owner confers on the vendor other evidence of ownership, or of authority to dispose of the goods, than mere possession,'"  See, also, Barnard vs Campbell, 55 N. Y. 456, 14 Am. Rep. 289, as follows: "Two things must concur to create an estoppel by which an owner is prevented from asserting title to and is deprived of his property by the act of a third person without his assent: (1) The owner must have clothed the person assuming to dispose of the property

with the apparent title to or authority to dispose of it; (2) the person alleging the estoppel must have acted and parted with value upon the faith of such apparent ownership or authority so that he will be the loser if the appearances to which he trusted are not real." McMahon vs Sloan (Pa.) 51 Am. Dec. 601; Saltus vs Everett (N. Y. App.) 32 Am. Dec. 541. And many cases could be cited which sustain the text of Mr. Mechem, and, in our judgment, decide the doctrine stated to be the settled law.

Had the cause been submitted to the jury, and they had returned a verdict for appellant, it would have been the duty of the court, in our judgment, to have set the same aside, and therefore the court acted properly in directing a verdict for appellee. Hence the judgment of the court below is affirmed.